104 N.J. Super. 169 (1969)
249 A.2d 25
SOUTH SHORE NATIONAL BANK, A NATIONAL BANKING CORPORATION, PLAINTIFF,
v.
MARK M. DONNER, BETTE S. DONNER, RUTH SATSKY JEWELRY AND JULES BRUSKIN, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 7, 1969.
*171 Mr. William Furst, attorney for defendants Ruth Satsky Jewelry and Jules Bruskin.
Mr. Samuel A. Gennet, attorney for plaintiff (Mr. William D. Bierman, appearing).
MILMED, J.C.C. (temporarily assigned).
Defendants Ruth Satsky Jewelry, a corporation, and Jules Bruskin move for a summary judgment in their favor against plaintiff South Shore National Bank, contending that plaintiff has no legal right to maintain its suit against them.
The action was instituted by plaintiff bank against the defendants Mark M. Donner, Bette S. Donner, Ruth Satsky Jewelry and Jules Bruskin for, among other things, the recovery of $7,000 paid by the plaintiff (payor bank) to the Donners (payees) on a check drawn on plaintiff bank by the Quincy Mutual Fire Insurance Company, payment having been made by the bank over the stop payment order of the drawer insurance company.
It is undisputed that on December 25, 1964 the Donners sustained a burglary loss while insured under a policy covering theft of personal property issued by the Quincy Mutual Fire Insurance Company of Quincy, Massachusetts; that among the documents submitted by the Donners to the insurance company in connection with their proof of loss was an appraisal of certain items of jewelry and silverware made by defendant Jules Bruskin, president of defendant Ruth Satsky Jewelry; that these defendants knew that the appraisal was being prepared for the claim of Mark M. Donner and Bette S. Donner to their insurance carrier, Quincy Mutual Fire Insurance Company, in connection with their burglary loss; that in payment of this claim the insurance company (Quincy) issued to the Donners its check in the amount of $7,000, dated March 2, 1965 and drawn on plaintiff bank; that thereafter Quincy issued to plaintiff bank an order to stop payment on this check; that the Donners were notified of the stop payment order, but that nonetheless the *172 check was presented for payment and payment thereon was made by plaintiff bank.
Plaintiff contends that after the check of March 2, 1965 was issued, Quincy discovered that the Donners had willfully overvalued the stolen property listed in their proof of loss; that on March 8, 1965 Quincy issued to it an order to stop payment on the check; that on or about March 12 the Donners were notified that payment on the check had been stopped and the reasons therefor, but that nevertheless, in May of 1965, they presented the check for payment and it was mistakenly paid by plaintiff bank over the stop payment order.
Defendants Ruth Satsky Jewelry and Jules Bruskin were brought into the suit in two counts of the complaint: the sixth count, which alleges that they conspired with the Donners to defraud Quincy by knowingly preparing false estimates of the value of property for which claim was made upon Quincy; and the seventh count, which contends that by reason of the alleged conspiracy plaintiff bank is, in accordance with N.J.S.A. 12A:4-407, subrogated to the rights of Quincy against defendants.
In his affidavit in support of the motion for summary judgment defendant Jules Bruskin acknowledges that on or about January 4, 1965 he prepared on the letterhead of Ruth Satsky Jewelry an appraisal of certain items of jewelry and silverware in connection with the burglary loss alleged to have been sustained by the Donners for submission to their insurance carrier (Quincy); that Quincy settled the loss claim submitted to it by the Donners and issued to the Donners its settlement check in the amount of $7,000; that Quincy issued an order directing plaintiff (payor bank) to stop payment on the check; that plaintiff nonetheless failed to honor the stop-payment order and made payment on the check to the Donners; that he and Ruth Satsky Jewelry did not receive any payment or other valuable consideration from the Donners or from anyone for the preparation of the *173 appraisal, nor did they receive any portion of the proceeds of the $7,000 check.
In memoranda submitted in support of the motion for summary judgment it is contended that section 4-407 of the Uniform Commercial Code "Bank Deposits and Collections" (N.J.S.A. 12A:4-407) is the controlling statute; that this section limits plaintiff's cause of action as against parties to the check who would otherwise be unjustly enriched; that the only such parties in the case who can be unjustly enriched are defendant payees Mark M. Donner and Bette S. Donner; that neither Ruth Satsky Jewelry nor Jules Bruskin was a "holder of the item" within the meaning of this term as used in subsection (c) of N.J.S.A. 12A:4-407, and that accordingly there is no statutory or common law basis for the maintenance of the action as against defendants Ruth Satsky Jewelry and Jules Bruskin.
My analysis of the cited section (N.J.S. 12A:4-407) and other provisions of the Uniform Commercial Code which must be read in conjunction with it reveals no such restriction on its application. It is a basic principle of statutory construction that statutes "in pari materia are to be construed together as forming one act," Pondelick v. Passaic County, 111 N.J.L. 187, 193 (Sup. Ct. 1933), and "so as to effectuate the general legislative policy," Scatuorchio v. Jersey City Incinerator Authority, 14 N.J. 72, 85 (1953); and see Miller v. Board of Chosen Freeholders, Hudson County, 10 N.J. 398, 413 (1952). "[E]very word must be given full force and effect if possible," Lynch v. Borough of Edgewater, 8 N.J. 279, 286 (1951). The sense of a law is to be gathered "from its object and the nature of the subject matter and the whole of the context and the acts in pari materia. The parts of a statute are to be viewed in relation to the whole, and the motive which led to the making of the law, and reconciled, if possible, to carry out the reasonably probable legislative policy." Hackensack Water Co. v. Ruta, 3 N.J. 139, 147 (1949); and Giles v. Gassert, 23 N.J. 22, *174 33-34 (1956). "The principle that statutes in pari materia should be construed together is merely an extension of the principle that all parts of a statute should be construed together * * *" 2 Sutherland, Statutory Construction (3rd ed. 1943), § 5205, p. 544, and "each part or section should be construed in connection with every other part or section so as to produce a harmonious whole." Ibid., § 4703, at p. 336.
Section 4-407 of the Uniform Commercial Code (N.J.S. 12A:4-407) provides that:
"If a payor bank has paid an item over the stop payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank shall be subrogated to the rights
(a) of any holder in due course on the item against the drawer or maker; and
(b) of the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose; and
(c) of the drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose."
This section is broader in scope than the prior subrogation statute, N.J.S.A. 17:9A-225 (D) (4), which apparently served as its model and was repealed by the enactment of the Uniform Commercial Code, e.g., including within its coverage not only payments made over stop payment orders but also payments made "under circumstances giving a basis for objection by the drawer or maker." See N.J.S. 12A:10-105 and New Jersey Study Comment 2 under N.J.S.A. 12A:4-407.
Other sections of the Uniform Commercial Code bearing upon the bank's rights as against all defendants in the present case are sections 1-102, 1-103, 1-201 (36), 3-401, 3-418 and 4-403. (N.J.S. 12A:1-102, 1-103, 1-201 (36), 3-401, 3-418 and 4-403).
*175 Section 1-102 mandates a liberal construction of the Uniform Commercial Code and its application to promote its underlying purposes and policies. Section 1-103, N.J.S. 12A:1-103, states that:
"Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."
In regard to this section, Uniform Commercial Code Comment 5 under N.J.S.A. 12A:4-407 points out that "The spelling out of the affirmative rights of the bank in this section does not destroy other existing rights (Section 1-103)," including "rights to recover money paid under a mistake." Similarly, Uniform Commercial Code Comment 8 under N.J.S.A. 12A:4-403 points out that:
"A payment in violation of an effective direction to stop payment is an improper payment, even though it is made by mistake or inadvertence. Any agreement to the contrary is invalid under Section 4-103 (1) if in paying the item over the stop payment order the bank has failed to exercise ordinary care. The drawee is, however, entitled to subrogation to prevent unjust enrichment (Section 4-407); retains common-law defenses, * * * and retains common-law rights, e.g., to recover money paid under a mistake (Section 1-103) in cases where the payment is not made final by Section 3-418."
Section 1-201 (36), N.J.S. 12A:1-201 (36), defines "rights" to include "remedies."
Of course it is obvious that the payment by plaintiff bank in this case was not made final by section 3-418. That section, among other things, specifically excepts from its operation "recovery of bank payments as provided in the Chapter on Bank Deposits and Collections (Chapter 4)." Turning to section 3-401 (1), which provides that "No person is liable on an instrument unless his signature appears thereon," Uniform Commercial Code Comment 1 under *176 N.J.S.A. 12A:3-401 aptly points out in part that "Nothing in this section is intended to prevent any liability arising apart from the instrument itself. The party who does not sign may still be liable * * * in tort for misrepresentation * * *." The remaining related section referred to above, i.e., section 4-403, relates to the customer's right to issue to his bank a binding order to stop payment of any item payable for his account.
The gravamen of the sixth and seventh counts of the complaint in this action is an alleged conspiracy among defendants to defraud the Quincy Mutual Fire Insurance Company by means of "false estimates of the value of property for which claim was made upon the said insurance company." Here it is accordingly alleged that the defendants' tortious actions combined to produce a single indivisible result, i.e., issuance of the check of $7,000 by Quincy to the Donners. In such circumstances, joinder of the defendants would be sanctioned even under the strict common law rules limiting joinder of defendants in actions sounding in tort "to cases of concerted action, where a mutual agency might be found." See, Prosser, Torts (3rd ed., 1964) § 44, p. 260. The joint alleged responsibility of the defendants to Quincy would be apparent and "the identity of the cause of action against each defendant" would be entirely clear. Ibid., p. 260. See also Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 82-83 (1954). And see Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 29 (1957), wherein it is pointed out that "A person is liable with another if he `knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself * * *.' 4 Restatement, Torts (1939), sec. 876 (b)."
It is evident from an analysis of the related sections of the Uniform Commercial Code referred to above that by section 4-407, as supplemented by the broad provisions of section 1-103, the Legislature intended to grant to a payor *177 bank which has mistakenly paid an item over the stop-payment order of the drawer or maker, a full and effective remedy by way of subrogation to the rights and remedies of the drawer or maker against the payee as well as those who have, by their tortious acts in concert with him, combined to produce the single indivisible result, e.g., the issuance of the item to the payee, the remedy being furnished not only to prevent unjust enrichment but also to the extent necessary to prevent loss to the bank by reason of its payment of the item. See New Jersey Study Comment 1 and 2 under N.J.S.A. 12A:4-407. Comment 1 states in part that "subrogation, in the case of the improperly paid check, permits the bank to step into the position of the person receiving payment, the payee, some other holder, or the drawer," and Comment 2 points out in part that section 4-407 would not permit a bank to subrogate "unless some party has been `unjustly enriched.'"
While the remedy afforded by section 4-407 is in part expressly directed to the prevention of "unjust enrichment," nowhere in the statute is there any requirement that all of the defendants who may be joined in the action be "unjustly enriched." The reasonable implication is that the Legislature intended that the remedy granted be comprehensive and effective. See 3 Sutherland, Statutory Construction (3rd ed. 1943), § 5402; Juzek v. Hackensack Water Co., 48 N.J. 302, 314-315 (1966); and Giles v. Gassert, supra, 23 N.J., at pp. 33-34.
The editorial staff of the Banking Law Journal, in commenting on the objective of section 4-407, concisely pointed out that "The aim of the Code provision is clear enough: the payor bank by paying over a stop order would have paid out its own money and would be given remedies to make itself whole." "Stopping Payment of Checks," 79 Banking L.J. 204 (1962). See also, Clarke, Bailey & Young, ALI-ABA Bank Deposits and Collections, 159 (1963); and Rapson, "Article 4  Bank Deposits and Collections," 17 Rutgers L. Rev. 79, 101 (1962).
*178 It is not contended that the movants, Ruth Satsky Jewelry and Jules Bruskin, have in any way changed their position in reliance on the bank's payment of the check. Nor is there any suggestion that any injustice is done to them by the subrogation. Their position is the same as it would have been had they been impleaded along with the Donners as third-party defendants in an action by Quincy against the bank to have its account recredited. In such litigation the burden would be upon Quincy to establish the fact and amount of loss resulting from the payment of the check over the stop-payment order. See N.J.S. 12A:4-403. See also, Editorial Staff of the Banking Law Journal, "Stopping Payment of Checks," 79 Banking L.J. 203-205 (1962); and Tradesmen's Building &c. Ass'n v. Thompson, 32 N.J. Eq. 133, 135 (Ch. 1880).
Subrogation, "an ancient equitable device to compel the ultimate discharge of an obligation by one who in good conscience ought to pay it," George M. Brewster & Son, Inc. v. Catalytic Const. Co., 17 N.J. 20, 28 (1954), "is highly favored in the law," Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162, 171 (1954), and "the tendency is to extend rather than restrict its application," 2 Lawrence, Equity Jurisprudence, § 622, p. 708 (1929). "It is a right of ancient origin, having been imported from the civil law to serve the interests of essential justice between the parties," Standard Accident Ins. Co. v. Pellecchia, supra, at p. 171, and although of equitable origin and enforced on equitable principles "recovery is generally sought at law," Ibid., at p. 172. See also, 4 Pomeroy, Equity Jurisprudence (5th ed. 1941), §§ 1416 and 1419, pp. 1070, 1072-1074. Considering the nature of the allegations contained in the sixth and seventh counts of plaintiff's complaint, the remedy in this case should be most extensive. As pointed out in 3 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 918, at p. 601, "The remedy which equity gives to the defrauded person is most extensive. It reaches all those who were actually concerned in the fraud * * *."
*179 Similarly governed by equitable principles is the right to recover money paid under mistake, particularly where, as here, it is alleged that the mistake was induced by inequitable conduct of the payees (in presenting the check for payment after being notified that payment had been stopped and the reasons therefor) and it is not contended that defendants have changed their position in reliance on the payment made. While "the action to recover back money paid by mistake is a very familiar one at law," 3 Pomeroy, op. cit., § 869, at p. 382, the "right to recover is governed by principles of equity * * *." Ibid., note 13, at p. 382. See also Ibid., § 870a, at pp. 388-389; 5 Williston, Contracts (rev. ed. 1937), § 1574, pp. 4400-4404, and § 1598, at p. 4453; 3 Blackstone, Commentaries (Lewis ed., 1922), 163, at pp. 1154-1155); Great American Ins. Co. v. Yellan, 58 N.J. Super. 240, 244-245 (App. Div. 1959), and Young v. State Farm, etc., Ins. Co., 80 N.J. Super. 582, 585 (App. Div. 1963). In discussing remedies available for mistake, Professor Corbin points out in part that:
"The court must be acutely aware of the wide extent of its powers and of the variety and flexibility of its remedies. Mould the decree so as to fit the mistake and to correct its unjust results, giving due consideration to the situation as it now exists, to changes of position, to the character of each party's conduct, and to the rights and interests of third parties. * * *" Corbin on Contracts, (One vol. ed., 1952), c. 29, § 613, at p. 568.
See also, 1 Pomeroy, op. cit., § 114, pp. 152-153.
Plaintiff's claims for recovery of the $7,000 which it paid on the check rest comfortably within the ambit of each of these two expansive remedies. Plaintiff bank having requisite standing to maintain this suit, the factual issues between the parties, including the strongly contested charge of conspiracy to defraud, are for determination at a plenary trial. R.R. 4:58; and see Judson v. Peoples Bank & Trust Co. of Westfield, supra, 17 N.J., at p. 76. The motion for summary judgment is accordingly denied.