## Aljax Corporation v. Connecticut Mutual Life Insurance Company

Before Chalfin, Alexander and Reed, JJ.

*Dante W. Renzulli* and *Picciotti & Renzulli,* for plaintiff.

*Richard E. McDevitt* and *Montgomery, McCracken, Walker & Rhoads,* for defendant.

CHALFIN, J., October 24, 1972.—This litigation involved an attempt by plaintiff corporation to compel defendant insurance company to pay the benefits under life insurance policies alleged to be in force at the death of the insured. The case was tried below by Judge Chalfin, sitting without a jury, and the court found for defendant on post trial motions. Plaintiff requested a court en banc and the issue was submitted on briefs. After careful consideration of both briefs, we find that the trial judge did not err and affirm the judgment.

The facts can be summarized as follows: In the spring of 1968, Connecticut Mutual Life Insurance Company sold four insurance policies, two with a cash value of $150,000 and two with a value of $50,000.

The beneficiary of the larger policies was plaintiff, Aljax Corporation. The insureds were John Jofolla, Aljax's president, and Alexander Colanero, Aljax's treasurer. The smaller policies were on the lives of the same men, the beneficiary being the C. & J. Construction Company. All the above policies became effective on May 19, 1968.

Both policies were to have their premiums paid through a check service known as the ConnMuMatic Check Service. Under this plan, Connecticut Mutual would issue a check (of Aljax) and deposit it with its bank in Hartford, Conn. This bank, in turn, would "tentatively" credit the account of Connecticut Mutual. The Hartford Bank would then send the draft through the Federal Reserve System to be honored by Girard Bank, the Philadelphia correspondent bank. The local bank would then charge the account of its customer, Aljax Corporation. The cancelled check would then be sent to the customer on the second working day of each month along with the statement and other checks for the preceding month.

Mr. Colanero and Mr. Jafolla both obtained life insurance policies with Reliance Life Insurance Company for $200,000 each, which became effective in early January of 1969.

On January 14, 1969, Colanero instructed the office manager of Aljax Corporation, Mr. Capuzzi, to telephone Girard Bank and direct them to cancel the check service and no longer to honor any drafts sent to them by Connecticut Mutual. Capuzzi did so and this was confirmed in writing by a letter to Girard on the same day signed by Colanero.

Connecticut Mutual, unaware of this, routinely sent the draft for the January payment on or about January 15, 1969. This draft was erroneously honored

over Aljax's stop-order and was charged to Aljax's account.

Upon learning of this improper payment, when receiving their bank statement in early February, Capuzzi, with the consent of Colanero and Jafolla, wrote Girard asking for a reimbursment of the payment.

Connecticut Mutual received notice of the cancellation of the check service in a letter from Girard dated February 13, 1969, which also requested reimbursement of the check paid in error. This notice was received by Connecticut Mutual on February 17, 1969, after they had already submitted a draft for the February premium payment.

Girard Bank erroneously charged the Aljax account for the amount of the February premium. By letter dated February 21, 1969, Connecticut Mutual sent a check to reimburse the January payment which had been paid in error. Aljax was informed on February 25, 1969, that their account had been reimbursed for the erroneous January payment. Girard discovered the February erroneous payment on March 7, 1969, through a letter from Connecticut Mutual which informed them that their (Girard's) letter of February 13, 1969, was received too late for them to stop payment of the February draft.

Colanero and Jafolla left for a vacation in early March. Jafolla was killed in a plane crash on March 5, 1969.

On April 11, 1969, Connecticut Mutual sent a check in reimbursement of the erroneous February payment, after receiving no response to inquiry to Girard on March 7, 1969, concerning the status of the February payment.

Through some further error, the check was returned to Connecticut Mutual when Girard found out

that they had charged the Aljax account for the February premium. A reimbursement was then requested by Girard and Connecticut complied on March 26, 1969.

The $150,000 life insurance policy on Jafolla had a due date for the premiums of the nineteenth of each month and there was a 31-day grace period. The last valid premium payment made was the one due December 19, 1968. Therefore, the policy was effective until February 19, 1969, at which time it lapsed. (There was no automatic premium loan available, because the policy had not been in existence a sufficient time.) The two $50,000 policies were allowed to lapse and no difficulties in cancelling the check service were incurred.

It is clear that Aljax's request to cancel the check service was never rescinded.

The drafts which were mistakenly charged to Aljax's account by Girard Bank did not constitute valid, actual premium payments. Since there was no ratification of the February payment by Aljax, the policy on the life of John Jafolla was not in force at the time of his death.

Initially, it is relevant to note that there is a scarcity of judicial reflection on these issues in Pennsylvania. The ConnMuMatic check service agreement has a provision which reads as follows:

"No premium or portion thereof shall be deemed to have been paid unless and until THE CONNECTICUT MUTUAL LIFE INSURANCE COMPANY receives actual payment at its Home Office and no check drawn by the company shall constitute a receipt for the premium unless it is honored."

The insurance contract provides for termination upon failure to pay the premium by the end of the 31-day grace period.

Plaintiff argues that there was final payment. This argument is based upon 12A PS §4-213 (1960), Act of April 6, 1953, P. L. 3, as amended, which relates to when a payor bank is considered to have made final payment. However, reliance on this section ignores the effect of 12A PS §4-403 (1960), which deals with a customer's right to issue a stop order with his bank. Comment number 8 to the above-mentioned section states:

"A payment in violation of an effective direction to stop payment is an improper payment, even though it is made by mistake or inadvertence."

There is no doubt that the cancellation of the check service constituted an effective stop order on the part of Aljax. As soon as Connecticut Mutual learned of the stop payment, they refunded the January check to Girard Bank who credited it to Aljax's account. This was done at Aljax's request and they were informed of this refund by Girard. 12A PS §4-407 (1960) discusses a payor bank's right to subrogation when an improper payment is made. This provision has been interpreted as allowing a payor bank to recover since "by paying over a stop order [the payor bank] would have paid out *its own* money": Stopping Payment of Checks, 79 Banking L.J. 185, 204 (1962). See also South Shore National Bank v. Donner, 104 N.J. Super. 169, 177 (1969). (Italics supplied.)

This is not to deny, of course, that a customer has a right to ratify a payment over a stop order. However, we hold that no ratification took place here. The actions of plaintiff regarding the improper January payment impel us to cast a jaundiced eye at plaintiff's theory of ratification. This is especially true in light of 12A PS §1-103 (1960), which provides that:

"Unless displaced by particular provisions of this Act, the principles of law and equity . . . and the law relative to . . . estoppel . . . or other validating or invalidating cause shall supplement its provisions."

We do not find any intent on behalf of either of the parties that these mispayments were to be treated as premium payments. Any intention to this effect on the part of plaintiff appeared to develop after the death of Jafolla.

Additionally, defendant did not, and could not have, treated the money as a premium payment. In Union Central Life Ins. v. Williams, 65 F. 2d 240 (5th Cir., 1933) affirmed 291 U.S. 170 (1934), the issue was whether dividend funds of the insured should have been used by the company to extend his insurance beyond the lapse date. The policy, in that case, read that such an election was in the hands of the insured. The decedent was in fair health at the time of the lapse and it was not likely that he would die shortly. The court there held that had the company applied the dividend to extend his insurance and had he survived the extension, he could have sued to recover the misapplied cash.

In the instant case, defendant insured company was aware of the stop order by the time of the February payment. Similarly, they had no right under these circumstances to use it as a premium payment and they were not a holder in due course because of this knowledge.

For the above reasons, we find no error in the trial judge's determination and affirm the judgment. Plaintiff's exceptions are dismissed.