**M. J. DOYLE and General Energy Resources, Inc., Plaintiffs,**

v.

**NORTHROP CORPORATION, Defendant.**

**Civ. A. No. 76–2472.**

United States District Court, D. New Jersey.

May 5, 1978.

As Amended June 20, 1978.

---

Wolf, Block, Schorr & Solis-Cohen by Leonard J. Bucki, Philadelphia, Pa., Hartman, Schlesinger, Schlosser & Faxon by Jan M. Schlesinger, Mount Holly, N. J., for plaintiffs.

Archer, Greiner & Read by George F. Kugler, Jr., Haddonfield, N. J., for defendant.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

CLARKSON S. FISHER, District Judge.

This action was instituted by the plaintiffs M. J. Doyle and General Energy Resources Inc. (hereinafter GERI) in the New Jersey Superior Court, Chancery Division, wherein they sought to enjoin and restrain the defendant, Northrop, from enforcing a security agreement. Further they sought an order adjudging the defendant as having no interest in the notes, monies, etc., received by plaintiffs to the extent of taxes due and statutory liens pursuant to N.J.S.A. 2A:102–10 & 11.

The defendant removed the action to this Court and moved for summary judgment on its first seven counterclaims. The basis of those counterclaims being the money allegedly due the defendant from plaintiff as a result of various notes, guarantees, and a revolving loan agreement. The motion was denied without prejudice.

The defendant then moved for an injunction pendente lite:

A. Compelling plaintiffs to account for all funds received under 17 enumerated contracts.

B. Compelling plaintiffs to account for all funds received or to which plaintiffs are entitled.

C. Compelling the opening of an interest bearing account and depositing all monies hereinafter received with weekly reports thereon.

D. Directing that there be no withdrawal from the above mentioned account except upon order of the Court.

Parts A and B of the motion were granted and parts C and D were denied.

The defendant then moved for summary judgment on the 9th Count of its counterclaim. By that, defendant demanded that the security interest be found valid; that all demands for payment on notes be complied with; that there be a foreclosure of the liens held against the plaintiffs' collateral with proceeds to go to pay off the debt. At the hearing on that motion it was determined that further discovery was necessary in order to conclude the matter. The motion was adjourned pending discovery, at which time there was a consolidated hearing on the motion and a bench trial.

The Court finds the following relevant and credible facts pursuant to F.R.Civ.P. 52.

(1) The initial involvement of Northrop with the plaintiffs began in 1972. At that time the defendant desired to diversify its interests. To that end it purchased a 23% interest in the common stock of GERI and also agreed to make a loan of 1.5 million dollars to GERI.

(2) At that time GERI was a moderate size company with sales in the range of twenty to thirty million dollars.

(3) It was the desire of GERI to expand its operations into the field of nuclear power. This was to be accomplished through the purchase of small regional companies around the country. These small companies would then bid on jobs which, if the bids were accepted, would then be worked on by

those companies with the aid and assistance of GERI.

(4) GERI was successful in expanding its operations with the result that there was a work backlog in the vicinity of 100 million dollars. As a result of this increase large sums of cash were required for the company to operate.

(5) As a result of plaintiffs' restricted cash flow and in furtherance of their relationship, plaintiffs and defendant entered into a series of agreements, the first of which was the March 5, 1976 agreement. By that agreement GERI and its subsidiaries granted the defendant a security interest in the following items: All accounts receivable, notes, drafts, contract rights, claims, retainages, choses in action, machinery, equipment, inventory and general intangibles now or hereafter existing, wherever located, together with the proceeds of any and all of the foregoing. [P-4 in evidence—March 5, 1976 security agreement.]

(6) Plaintiffs contend that paragraph 1 in that first agreement required the consent of third parties before a valid security agreement could have been created. The defendant states that this is not so, a position with which I agree. The language in that paragraph does not mandate consent from third parties, rather it states that if such consent is needed, it must be obtained. Thus consent is not a prerequisite to the creation of a valid security agreement. Further, in their answer to paragraph one of the defendant's ninth counterclaim, the plaintiffs specifically admit that they entered into a security agreement. No mention is made in that answer to its alleged invalidity. The fact that letters were sent out by GERI seeking consent in no way controverts this finding, as the basis of their contention is incorrect. It was not necessary to have received consent in order for there to have been a valid security agreement.

(7) The security agreement was duly perfected by the filing of a financing statement in various states including New Jersey, filed March 28, 1976 re M. J. Doyle and GERI. [P-14, ¶ 7].

(8) In the March 5, 1976 agreement the plaintiffs warranted that no other security interest had been granted in the collateral named therein except as was granted to Northrop. Further that there were no liens against any of the property and that plaintiffs would have good and clear title to any after-acquired property. [P-4, ¶ 3(a)].

(9) The plaintiffs attempt to counter this fact by stating that their projects were bonded by the Maryland Casualty Company and that Northrop was cognizant of a blanket indemnity agreement between Maryland Casualty and GERI. Additionally they contend that the indemnity agreement made certain assignments of collateral to Maryland as security and that the blanket indemnity agreement was to constitute a security agreement and financing statement. [P-7, ¶¶ 3 and 5 respectively]. This in no way controverts my finding in paragraph 8 above. There has been no showing that the so-called "financing statement" was ever filed, and even if it had been, that merely goes to the matter of priorities, which is not directly at issue in this case.

(10) Plaintiffs also represented in the March 5, 1976 agreement that they would not grant a security interest to any others in the collateral, nor allow any liens to be incurred, that the collateral would not be levied upon, that the collateral would not be disposed of, other than in the normal course of business, without defendant's consent, and that they would not allow the value of the collateral to be impaired. [P-4, ¶ 4(b)].

(11) After entering into the March 5th agreement, certain events occurred including, but not limited to, the termination of a contract by a customer which caused Northrop to revaluate its position. What resulted was a business plan calculating the needs of the Company and the direction it would take. This was memorialized in the second agreement of the parties dated April 22, 1976. [P-8].

(12) Portions of the April 1, 1975 agreement were terminated or amended by the April 22, 1976 agreement, as noted therein. The validity of the March 5, 1976 agree-

ment, however, was in no way diminished by the execution of the April 22, 1976 agreement.

(13) The April 22 agreement granted a security interest in those items mentioned in Exhibit C appended thereto and referred to in the agreement as collateral. [D–8 Article IV, ¶ 4.5(a); ¶ 4 of the Complaint].

(14) With regard to that collateral the plaintiffs warranted and made representations similar to those referred to in my findings numbered 8 and 10 regarding the March 5, 1976 agreement. [D–8 Article VI, ¶ 6.21(a)–(c) and Article IV, ¶ 4.5(e)].

(15) Some three weeks after signing the April 22 agreement, certain facts came to light which made Northrop aware that even under this newly signed agreement, GERI's financial position was not improved, nor did it appear that it would be.

(16) Rather than exercise its rights against the collateral, or exercise full control over GERI, both of which Northrop believed to have been within its rights, Northrop decided to place four of its officers on the GERI Board of Directors. This was felt to have been the best approach in that it would allow Northrop to evaluate the position of GERI, especially in light of the fact that Northrop had twice before believed they had placed GERI in a sound economic position only to learn later that this was not the case.

(17) To this end the parties entered into their third agreement in this series. This being the agreement of June 8, 1976.

(18) This agreement was the culmination of a series of meetings which took place on June 7th and 8th, 1976. These meetings were, in fact, a group of presentations by GERI of a new business plan regarding the various aspects of the business so as to inform the Northrop people of what was going on, what was planned and to seek to get more money, somewhere in the vicinity of six million dollars.

(19) After these meetings the attorney for Northrop, McCabe, and the attorney for GERI, McConomy, drafted the June 8th agreement which was executed that same day by Doyle on behalf of the plaintiffs.

(20) The Northrop people who were placed on the GERI Board were Stevens, Lewis, Gibney and McCabe.

(21) It was Northrop's intent to have their people remain on the GERI Board only for as long as it was necessary for GERI to get into a healthy financial condition.

The plaintiffs allege that on the evening of June 7, 1976 a meeting occurred between Doyle and Stevens and that the outcome of this meeting was an agreement by Stevens, on behalf of Northrop to commit more funds to GERI and to forbear foreclosure on any debts due to Northrop in order to allow or aid one of three things to occur: (1) the orderly liquidation of GERI, (2) stabilization of GERI in order to achieve an improved financial condition, or (3) development of GERI such that it would become a prominent force in the field of nuclear energy. This is alleged to have been in exchange for the acquiescence of GERI to Northrop placing four of its officers on the GERI Board of Directors. In this regard plaintiffs place reliance on the following:

(a) The Minutes of the Northrop Board of Directors to the effect that

Under the attached agreement, Northrop has the right to dispose of the assets of GERI, settle outstanding disputes or litigations and even *go so far as to cause an orderly liquidation of the company.* (Emphasis added).

(b) Paragraph E of the June 8, 1976 agreement which states that the agreement is "[i]n lieu of the formal exercise of Northrop's creditor's rights, and until Northrop exercises such rights. . . ."

(c) That the agreement specifically reserves its rights under the April 22 agreement and the April 1 pledge agreement, but makes no reservation of its creditor's rights under the March 5, 1976 agreement.

(d) The fact that on prior occasions recommendations or proposals to the Northrop Board had always been allowed.

(e) The statement by Stevens at the hearing on the motion for summary judg-

ment that the agreement was something short of a full exercise of control of the plaintiffs and short of moving against the collateral.

(22) I find, however, the plaintiffs' claim of an alleged oral agreement to forbear to be unsupported by the evidence. Much contradictory evidence regarding this issue has been introduced, and I find the evidence adduced by the defendant to be persuasive. That evidence is as follows:

(a) The agreement, which was drafted by attorneys for both sides, makes no mention anywhere of an agreement to forbear collection.

(b) The agreement itself is fully integrated.

(c) The alleged oral agreement would contradict the written agreement in that paragraph E says that they may still exercise their rights as creditors.

(d) None of the other parties who were present on the days of negotiation were privy to information regarding any oral agreement to forbear.

(e) If, in fact, there was such an alleged oral agreement, the duration of such agreement is extremely indefinite. The plaintiffs contend the duration shall be the length of time it would take for one of three options, stated just prior to my finding number 22, to occur. I find this highly incredible in light of what occurred the past two times Northrop entered into agreements with the plaintiffs.

(f) The fact that there was no commitment by Northrop to lend any more funds to the plaintiffs, only some obscure statement that a recommendation would be made to the Northrop Board. [Memo of June 9 from Stevens to Paine.]

(g) If, in fact, there were the three alternatives as stated by Doyle, Northrop would have had the power to choose which alternative it would opt for.

(h) The affidavit of Stevens filed June 15, 1977 wherein he states, at paragraph 10, that he told Doyle that Northrop would forbear for a limited period of time, during

the late Summer and early Fall, in no way disrupts this finding. That statement refers to a period after the September 15th Board of Directors' meeting and not the June 8th agreement.

(23) After getting on the GERI Board of Directors, the Northrop people learned of the difficulties that were occurring in the business and at one point came to believe that the company may even have had a negative net worth. Further the company now said it would need an additional five to ten million dollars to operate.

(24) Northrop held a Board of Directors' meeting on September 15, 1976 in order to consider its options regarding GERI in light of what was learned by Northrop's people on the GERI Board. None of these options included advancing further funds. A Resolution was passed by the Board stating no further funds would be committed and that a move should be made to recover whatever possible.

(25) Stevens spoke with Doyle and told him of the Board of Director's Resolution and that for the time being they would not take direct action against their security. This is the forbearance for the limited time period that Stevens referred to in his affidavit. [Finding 22(h)].

(26) Formal default was declared on October 22, 1976 from which time Northrop sought to enforce its security agreement. [P–9].

(27) GERI owes Northrop a principal amount of $27,118,407.

(28) The total principal formally due was $27,918,407 but by virtue of Northrop's purchase of a GERI asset, a sum in the amount of $800,000 was credited to GERI against the principal.

(29) Interest due on this money accrues at the rate of 7%. As of December 1, 1977 total interest amounted to $3,336,882. Cash was received by Northrop from GERI in the amount of $540,931. Notes were received by Northrop from GERI in a face amount of $360,000. Both cash and notes were credited against interest due leaving a total of $2,435,951 interest due as of December 1,

1977. Thereafter interest accrues at the rate of $6,646 per day.

(30) The total principal and interest due as of December 1, 1977 is $29,544,358. [D–7].

(31) The original principal amount of $27,918,407 is comprised of the indebtedness noted in the affidavit of Frederick Stevens, P–14 in evidence.

(32) By letter dated October 21, 1976 Northrop accelerated the maturity of all term obligations of GERI and demanded payment of all principal and interest on GERI's demand obligations.

Jurisdiction arises under the Federal Diversity Statute, 28 U.S.C. § 1332. In resolving these matters in this diversity case I am governed by the rule of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, and am obliged to apply the applicable state law. Thus I must take up the question of which state law governs.

The Supreme Court has held that in order to conform to the dictates of *Erie, supra,* and to insure the "equal administration of justice" a federal court sitting in a diversity case must apply the forum state's choice of law rule. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1940); *Waggaman v. General Finance Co.,* 116 F.2d 254, 257 (3d Cir. 1940).

New Jersey courts have generally held that the validity of a contract is governed by the law of the place where it is made. *Colozzi v. Bevko,* 17 N.J. 194, 110 A.2d 545 (1955). However, this does not preclude the parties from expressly providing what law is to govern. *Mullaly v. Carlisle Chemical Works, Inc.,* 177 F.Supp. 588, 593 (D.N.J.1959). In this regard the Uniform Commercial Code, 12A:1–105(1) expressly provides that "the parties may agree that the law of either this state or of such other state or nation shall govern their rights and duties." The one requirement is that the state's law which the parties have chosen, must bear a "reasonable relation" to the transaction involved. *See In re Lea*

*Fabrics Inc.,* 226 F.Supp. 232 (D.N.J.1964). The New Jersey Comment to that statute indicates that this requirement, that the state chosen bear a reasonable relation to the transaction, may, in fact, be a constitutional prerequisite. *Seeman v. Philadelphia Warehouse Co.,* 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 (1927).

In this case there are three written agreements and one alleged oral agreement which this Court must consider. All three written agreements have expressed that the law of a specific jurisdiction should govern. The March 5, 1976 agreement states, in paragraph 16, that the law of California shall govern. The other two agreements, *i. e.* the April 22, 1976 agreement and the June 8, 1976 agreement, in paragraph 17.11 and paragraph 9 respectively, state that the law of New Jersey is to govern. The requirement of a reasonable relationship is easily met with these two contracts as two of the parties, *i. e.* GERI and M. J. Doyle, are from within the state and some of the collateral appears to be or have been located within the state.

The question of which law is applicable to the oral agreement is a more difficult one. As stated earlier, the general rule in New Jersey is that the law of the place of contracting is the one used to determine its validity. *Colozzi v. Bevko, supra.* *See also Farris Engineering Corp. v. Service Bureau Corp.,* 406 F.2d 519 (3d Cir. 1969); *Congress Factors v. Malden Mills Inc.,* 332 F.Supp. 1384 (D.N.J.1971). This case presents a somewhat different circumstance than was found in those cases. "It is important to note that while a federal diversity court must not fashion a wholly independent federal standard with which to determine matters of substantive right, it likewise must not conceive its role as applying the state decisional law to the case at hand in a narrow and mechanical fashion. Rather, a federal court must scrutinize the relevant state precedents with an eye toward the broad policies and principles that underlie and are given concrete embodiment in the cases. *See Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 208–211, 76 S.Ct.

273, 100 L.Ed. 199 (1955); *Quinones v. United States,* 492 F.2d 1269, 1276–1279 (3d Cir. 1974)." *Meduecz v. Choi,* 569 F.2d 1221 at 1226, n. 14 (3d Cir. filed December 1, 1977).

■ Upon a review of New Jersey case law I have been unable to find any cases similar to this one. In considering this matter, however, I believe that the New Jersey Courts would find that the proper law to be applied would be that of New Jersey. I say this even though it would appear, at first glance, that the cases cited earlier would appear to indicate otherwise. The reasons for my belief are as follows: (1) Those cases have applied the rule of *lex loci contractus* either before the enactment of the Uniform Commercial Code, N.J.S.A. 12A:1–101 *et seq.,* or in cases where the parties made no express choice as to what law should apply and none could reasonably be implied; (2) this agreement was allegedly negotiated and agreed upon during the period of negotiations for the June 8, 1976 agreement; and (3) the plaintiffs contend that the consideration for the oral agreement is the consideration found in the June 8th agreement, thus to the extent it would be considered a valid agreement, it could be such only if considered an integral part of the June 8th agreement, and, as stated earlier, the law applicable to that agreement is New Jersey law. Thus it may reasonably be presumed that the parties intended New Jersey law to govern this alleged agreement also.

■ Thus under N.J.S.A. 12A:1–105(1),[1] parties are free to choose the law they wish to govern the transaction. However, the provisions of Article 9 of the Uniform Commercial Code, contains several conflict of law rules. Among those are transactions to which N.J.S.A. 12A:9–102[2] and N.J.S.A.

---

1. This section of the Code was amended in 1972 but the new amendment was not adopted in New Jersey. Parenthetically I note that this new § 1–105 was adopted in California. This new amendment, and the parallel amendments in Article Nine, mitigate many of the problems involved in choosing the law to govern a secured transaction having multistate ramifications. Since New Jersey has not adopted the new code section we are left with a, more or less, perverted renvoi.

2. N.J.S.A. 12A:9–102. Policy and Scope of Chapter.
 (1) Except as otherwise provided in 12A:9–103 on multiple state transactions and in 12A:9–104 on excluded transactions, this Chapter applies so far as concerns any personal property and fixtures within the jurisdiction of this State
 (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; and also
 (b) to any sale of accounts, contract rights or chattel paper.
 (2) This Chapter applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This Chapter does not apply to statutory liens except as provided in 12A:9–310.

(3) The application of this Chapter to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Chapter does not apply. L.1961, c. 120, § 9–102.
U.C.C. Comment 3 to this section states:
 3. In general this Article adopts the position, implicit in prior law, that *the law of the state where the collateral is located should be the governing law, without regard to possible contacts in other jurisdictions.* Thus the applicability of the Article is by this Section stated to extend to transactions concerning "personal property and fixtures within the jurisdiction of this state". This "narrow" approach, appropriate in the field of security transactions, should be contrasted with the "broad" approach stated in Section 1–105 with reference to the applicability of the Act as a whole. Section 9–103 states special rules relating to the applicability of this Article where the collateral consists of certain types of intangibles or mobile equipment, or property which is brought into this state subject to a security interest which attached in another jurisdiction. (Emphasis added).
New Jersey Comment 3 states that
 The rules applicable to § 9–102 (see also, § 9–103, § 9–104) are designed to assure, to the extent possible, that the law of a single jurisdiction will govern a particular security transaction regardless of the jurisdiction in which litigation regarding the security interest may arise. § 9–102, 9–103 and 9–104 have no present counterpart in New Jersey law.

12A:9–103 [3] apply. In these circumstances, regardless of N.J.S.A. 12A:1–105, the law governing the transaction will be the mandatory provisions stated in N.J.S.A. 12A:9–102 and N.J.S.A. 12A:9–103.[4]

N.J.S.A. 12A:9–102(1) intends that the substantive law of the place where the collateral is located governs "without regard to possible contracts in other jurisdictions." § 9–102, official comment 3, and § 9–103 official comment 1. This general situs rule is not without its exceptions as is noted by the specific reference to § 9–103. That section, although not definitive for all multistate transactions, does lay down a large number of specific choice of law rules re-

---

3. N.J.S.A. 12A:9–103, which governs the type of and the location of filing required in order to give proper notice states:

12A:9–103. Accounts, Contract Rights, General Intangibles and Equipment Relating to Another Jurisdiction; and Incoming Goods Already Subject to a Security Interest.

(1) If the office where the assignor of *accounts* or *contract rights* keeps his records concerning them is in this state, the validity and perfection of a security interest therein and the possibility and effect of proper filing is governed by this Chapter; otherwise by the law (including the conflict of laws rules) of the jurisdiction where such office is located.

(2) If the chief place of business of a debtor is in this state, this Chapter governs the validity and perfection of a security interest and the possibility and effect of proper filing with regard to *general intangibles* or with regard to goods of a type which are normally used in more than one jurisdiction (such as automotive equipment, rolling stock, airplanes, road building equipment, commercial harvesting equipment, construction machinery and the like) if such goods are classified as equipment or classified as inventory by reason of their being leased by the debtor to others. Otherwise, the law (including the conflict of laws rules) of the jurisdiction where such chief place of business is located shall govern. If the chief place of business is located in a jurisdiction which does not provide for perfection of the security interest by filing or recording in that jurisdiction, then the security interest may be perfected by filing in this state.

(3) If *personal property* other than that governed by subsections (1) and (2) is already subject to a security interest when it is brought into this state, the validity of the security interest in this state is to be determined by the law (including the conflict of laws rules) of the jurisdiction where the property was when the security interest attached. However, if the parties to the transaction understood at the time that the security interest attached that the property would be kept in this state and it was brought into this state within 30 days after the security interest attached for purposes other than transportation through this state, then the validity of the security interest in this state is to be determined by the law of this state. If the security interest was already perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this state, the security interest continues perfected in this state for four months and also thereafter if within the four month period it is perfected in this state. The security interest may also be perfected in this state after the expiration of the four month period; in such case perfection dates from the time of perfection in this state. If the security interest was not perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this state, it may be perfected in this state; in such case perfection dates from the time of perfection in this state.

(4) Notwithstanding subsections (2) and (3), if personal property is covered by a certificate of title issued under a statute of this state or any other jurisdiction which requires indication on a certificate of title of any security interest in the property as a condition of perfection, then the perfection is governed by the law of the jurisdiction which issued the certificate. L.1961, c. 120, § 9–103. (Emphasis supplied).

U.C.C. Comment 1 declares that though § 9–102 states the general rule that this article applies where the collateral is physically located within the state, § 9–103 states special rules with regard to three situations that have created difficulty earlier, most notably intangible collateral such as contract rights and accounts as defined in § 9–106.

4. It is obvious that in a situation such as is present here, where the collateral involved is located in many states and the nature of the collateral involved is of different types, the New Jersey system would and does create a great many problems. In contrast, under the revised code the general rule stated in 1–105 is not qualified, as it is now, by the policy and scope provisions of 9–102, but only by 9–103 which still states the choice of law rule for filing and perfection. The modifications made by the 1972 amendments indicate that 9–102 is now silent as to the conflict of law problem and thus 1–105 would govern. 9–103 as amended deals solely with the question of perfection and its affect on third parties.

garding creation, perfection and priorities in multistate transactions.

Therefore, although the parties purport to dictate the law which will govern, these provisions are for naught to the extent they are governed by § 9–102 and § 9–103 of the Code. Since Article 9 deals only with security interests, the parties choice as to what law shall govern other aspects of the agreements is valid and will be applied.

Case law within the Third Circuit seems to disagree as to whether a federal court sitting in a diversity action is governed by federal or state law with respect to the authority to take judicial notice of the laws of a sister state.[5] One line follows the view that under *Erie v. Tompkins, supra,* state law is controlling.[6] The other cases take the view that *Erie* did not affect a federal court's ability to take judicial notice of a sister state's laws in that *Erie* merely dictated the applicable substantive state law, not how it is brought to the attention of the court.[7]

■ F.R. Evidence 201, Act of January 2, 1975, Pub.L.No. 93–595, § 1, 88 Stat.1930, which states the only rule of evidence on the subject, now spells out the provisions for judicial notice of adjudicative facts. Taking the view, as I must because of this recent enactment by Congress, that federal law governs the taking of judicial notice as to adjudicative facts, I find that a sister state's laws are "capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned" and thus capable of judicial notice. I, therefore, take notice of all the relevant states' statutes.

■ In a contract case, the party relying upon the allegedly valid contract has the burden of establishing its validity. Further the breach of a contract may not be presumed, the burden rests on the party who asserts it to prove it. *Shapiro v. Solomon,* 42 N.J.Super. 377, 386, 126 A.2d 654 (App.Div.1956); *Terminal Const. Corp. v. Bergen, etc. Authority,* 34 N.J.Super. 478, 487, 112 A.2d 762 (App.Div.1954); modified 18 N.J. 294, 113 A.2d 787 (1955).

The plaintiffs contend that where the intent of the parties as to the meaning of contract terms is at issue, the language must be construed against the party who prepared it. *Paley v. Barton Savings and Loan Ass'n.,* 82 N.J.Super. 75, 83, 196 A.2d 682 (App.Div.1964), *cert. denied,* 41 N.J. 602, 198 A.2d 446 (1964); *Meehan v. Kaveny Bros. Oil Co.,* 27 N.J.Super. 547, 553, 99 A.2d 841 (App.Div.1953). Thus they claim that the inclusion, at the insistance of Northrop, of the paragraph requiring consents must be interpreted in a light most favorable to the plaintiffs and against the defendant. It is unclear who actually was the draftsman of those agreements. The fact that the defendant requested that something be included regarding consents would, however, indicate that, at least as to that paragraph, it's counsel was the draftsman.

■ The requirement that a contract or section thereof be·construed against the party who drafted it comes into play only when there is an ambiguity. *Terminal Const. Corp.,* 18 N.J. 302, 113 A.2d 787 (1955); *Herbstman v. Eastman Kodak Co.,* 131 N.J.Super. 439, 446, 330 A.2d 384 (App. Div.1971), *rev. on other grounds,* 68 N.J. 1,

**5.** Prior to the 1972 amendments some courts had taken the position that F.R.C.P. 43(a) was determinative as to whether or not judicial notice should be taken. 43(a) neither expressly or impliedly stated whether judicial notice of certain facts may have been taken and any reliance upon it would therefore have been misplaced. Alternatively some courts relied upon F.R.C.P. 44.1, albeit mostly in regard to the law of a foreign country, to determine whether judicial notice may be taken of a foreign law.

**6.** *Waggaman v. General Finance Co.,* 116 F.2d 254 (3d Cir. 1940); *Adam Hat Stores v. Lefco,*

134 F.2d 101 (3d Cir. 1943); *Louis Schlesinger Co. v. Kresge Foundation,* 260 F.Supp. 763 (D.N.J.1966), *vacated on other grounds,* 388 F.2d 208 (3d Cir. 1968), *cert. denied,* 391 U.S. 934, 88 S.Ct. 1847, 20 L.Ed.2d 854 (1968).

**7.** *Gallup v. Caldwell,* 120 F.2d 90 (3d Cir. 1941); *McDermott v. John Hancock Mut. Life Ins. Co.,* 255 F.2d 562 (3d Cir. 1958), *cert. denied,* 358 U.S. 935, 79 S.Ct. 324, 3 L.Ed.2d 306 (1959); *Mullaly v. Carlisle Chemical Works, Inc.,* 177 F.Supp. 588 (D.N.J.1959).

342 A.2d 181 (1971). As I indicated in my findings of fact, paragraph 6, it is unreasonable to say that consents were a necessary prerequisite to a valid security interest. The language is unambiguous and without doubt, in that it states that consents are to be obtained only if needed. Plaintiffs claim that it is necessary to obtain the consent of owners, general contractors, or whoever GERI had contracts with. As indicated in my findings, it did not appear that the consent of any such parties ever became necessary. Now, in an attempt to buttress their claim, plaintiffs say that it was also necessary to obtain the consents of the materialmen and laborers. I find no support for this contention either in the agreement itself or in any evidence introduced. This is further supported by the fact that GERI sent out letters seeking consent, but only of the project owners, not of the laborers or anyone else.

Plaintiffs cite N.J.S.A. 2A:102–10 & 11 in an attempt to further fortify their claim that it would be necessary to get the consents of labormen and materialmen in order to create a valid security interest. This is based, in part, upon the consent argument already disposed of and also on the basis of the fact that these statutes create a criminal penalty for the diversion of funds due these people.

■■■■ It is axiomatic that a statute existing at the time a contract is entered into becomes a silent part of that contract. *Red Bank Bd. of Ed. v. Warrington*, 138 N.J.Super. 564, 568–569, 351 A.2d 778 (App. Div.1976); *Gibraltor Factors Corp. v. Slapo*, 41 N.J.Super. 381, 384, 125 A.2d 309 (App. Div.1956), *aff'd.* 23 N.J. 459, 129 A.2d 567 (1957). Thus N.J.S.A. 2A:102–10 and 11 automatically became a part of these agreements.

Plaintiffs claim that enforcement of this agreement is against public policy and that since there is a criminal penalty imposed for violating the Act, the contract is void.

■■■■ The defendant does not contest the fact that the rights of labormen and materialmen are superior to its rights. Nor does it appear that the defendant intended, by entering into those agreements, to divert funds properly due and owing these people. Rather, the defendant points to the fact that no evidence was introduced that there was any money due these people other than the testimony of Doyle that there is currently due an amount of some $10,461.34 as of October 10, 1977. (*See* Plaintiffs' Exh. 13). Furthermore, it was not shown that the plaintiffs have had or will have any difficulty in paying the amounts due if the security agreement is found valid and the defendant is allowed to foreclose on the collateral. Since the superiority of the labormen's amd materialmen's claims is uncontested and, in fact, their right to payment is guaranteed by statute, the plaintiffs' claim in this regard is ineffective.

Finally, the plaintiffs argue that section 9–318(4) which provides,

"A term in any contract between an account debtor and an assignor which prohibits assignment of an account or contract right to which they are parties is ineffective." [8]

is applicable only to any profit or equity due the contractor after payment of all laborers and materialmen.

■■■■ This section expressly precludes an attempt to hold an assignment invalid and the endeavor by plaintiffs to bootstrap back into the consent argument is an extremely attenuated one and one which I find to be without merit.

---

**8.** This section was amended in 1972 and reads as follows:

"(4) A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the account debtor's consent to such assignment or security interest."

This amendment broadens somewhat the scope of this section so as to include general intangibles for money due as well as to accounts. This amendment has not been adopted in New Jersey.

The Uniform Commercial Code (Comment 4) amplifies the intent of the drafters. It states:

> Subsection (4) thus states a rule of law which is widely recognized in the cases and which corresponds to current business practices. It can be regarded as a revolutionary departure only by those who still cherish the hope that we may yet return to the views entertained some two hundred years ago by the Court of King's Bench.

The fact that the laborers and materialmen may have some claim against money paid to the subsidiaries of GERI in no way militates against this conclusion. Nor can it aid the argument that this consent was necessary to the validity of the security agreements.

The validity of the security agreement is challenged on three grounds: (1) Failure to properly file and therefore perfect their interest, (2) failure to obtain necessary consents, and (3) merger of prior contracts into subsequent "superseding" contracts.

The plaintiffs' major challenge regarding the creation or perfection of a security interest goes to the consent issue. As this basis has already been thoroughly discussed and disposed of in the preceding section, it will not be discussed here.

"Once [a security] interest is created, the secured party can always enforce it, on default, against the debtor, provided there are no third party interests superior to the interest of the secured party." White and Summers, *Uniform Commercial Code*, § 23-1, 785–786, 1972.

§§ 9–203 and 9–204 outline the requirements for a valid and enforceable security interest. § 9–203 states the requirements for its enforceability as follows:

(1)(a) the collateral is in the possession of the secured party; or

(b) the debtor has signed a security agreement which contains a description of the collateral . . . . In describing collateral, the word "proceeds" is sufficient without further description to cover proceeds of any character.

§ 9–204 states when the interest becomes effective, or attaches. It states, in part:

(1) A security interest can not attach until there is agreement (subsection (3) of section 1–201) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.

(2) For the purposes of this section the debtor has no rights,

. . . . .

(c) in a contract right until the contract has been made;

(d) in an account until it comes into existence.

(3) Except as provided in subsection (4) a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement.

. . . . .

(5) Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment.

Thus there are four basic requirements to the creation of a valid security interest: (1) A security agreement must be entered into; (2) the agreement must be in writing or the creditor must be in possession of the collateral; (3) the debtor must have rights in the collateral; and (4) the secured party must have given value.

There can be no doubt therefore that a valid security interest was created, as is found here in the conclusions of law.[9]

---

9. Plaintiffs make a conclusory allegation that the security interest of defendant was unperfected. No attempt is made to support this contention with any facts. The defendant on the other hand alleges that it was perfected by filing a financing statement in various states, including New Jersey. (Exhibit P–14, ¶ 7).

Perfection is a term of art. The most crucial consequence of perfection is the fact that it determines priority of interest of various interested parties. The most common means of

The next issue raised by the plaintiffs is interesting if somewhat specious. The plaintiffs allege that where there are two contracts, neither of which is compatible with the other, the more recent one would supersede the former. This contention is quite correct; however, such a finding would only be warranted in the circumstance where the two contracts in question, read together, deal with the exact same subject matter and are so inconsistent that though not explicitly expressed, it was obviously the intent of the parties that the latter supersede the former. *Rosenberg v. D. Kaltman & Co.*, 28 N.J.Super. 459, 101 A.2d 94 (Ch.Div.1953).

The inconsistencies which plaintiffs now allege for the first time would warrant such a finding, are: (1) The choice of law provisions in the March 5, 1976 and April 22, 1976 agreements; and (2) the fact that the June 8th agreement does not purport to grant a security interest whereas the other two do.

At first glance it might appear that the March 5th and April 22nd agreements are in conflict. A perusal of the facts behind the decision to enter into these two agreements, however, makes it patently clear that this contention is without merit. Each agreement was entered into for a specific purpose and in consideration of the then existing circumstances. See my findings of fact 12.

The contention that the defendant would relinquish its security interest in the collateral by entering into the June 8th agreement is even less meritorious. No reasonable person would have entered into such an agreement under the circumstances. At that time the plaintiffs were indebted to the defendant for some twenty million dollars, the company was having extreme financial difficulties and the defendant was doing all it could to salvage the most possible. It is inconceivable that in such a situation the defendant would have given up what was possibly its only hope of recouping any of its losses.

At the trial the plaintiffs introduced, over the objection of the defendant, evidence of an oral contract. The heart of the defendant's objection was that the introduction of evidence of such an agreement should be disallowed as violative of the parol evidence rule.

"It is not surprising that confusion results from a rule called 'the parol evidence rule' which is not a rule of evidence, which relates to extrinsic proof whether written or parol, and which has been said to be virtually no rule at all. As Thayer said of it, 'Few things are darker than this, or fuller of subtle difficulties.'" *Zell v. American Seating Co.*, 138 F.2d 641, 643 (2d Cir. 1943). "The 'parol evidence rule' is a rule of substantive law not related to interpretation or the admission of evidence for the purpose of interpretation." *Atlantic Northern Airlines v. Schwimmer*, 12 N.J. 293, 302, 96 A.2d 652, 656 (1953).

perfection is by filing a financing statement. The purpose of this statement is to give notice that a security agreement exists and to tell that person where more information is located. The classic question then becomes one of classifying the type of collateral involved. This is a potentially difficult hurdle, but not one that I have to leap at this time. The collateral in this case would appear, in large part, to be the type governed by § 9–103 of the Code.

As stated earlier, perfection is only a means of determining priority among various parties. Perfection, or the lack thereof, does not in any way detract from the validity of the agreement. "Though the present Code's distinction between 'validity' and 'perfection' creates some uncertainty because the former term is undefined, it seems reasonably clear that the line is between security interests enforceable against the debtor and security interests also enforceable against third parties such as lien creditors and subsequent lien creditors." 1 *Benders Uniform Commercial Code Reporting Service* § 3A.06, p. 212.9, n. 124, (1973). As this action is one between the debtor and the secured party I need not reach the question as to whether the financing statements were sufficient to perfect the defendant's interest. Furthermore, the plaintiffs, in the March 5, 1976 agreement, represented that no other security interest had been granted and that they would not grant any or allow any lien to attach to the collateral. The issue of the effect of N.J.S.A. 2A:102–10 and 11 will be dealt with in another section.

All the cases [involving the parol evidence rule] may indeed be accepted as precedents for the proposition that if the parties have stated the terms of their contract in the form of a complete written integration, it cannot be varied or contradicted by proof of antecedent negotiations and agreements. This is a mere statement of the obvious. There is no need to support it by a thousand citations.

3 *Corbin on Contracts*, § 573 at 368 (1960). *See also Atlantic Northern Airlines v. Schwimmer, supra; Childs v. South Jersey Amusement Co.*, 95 N.J.Eq. 207, 122 A. 803 (E. & A. 1923). Thus the plaintiffs may not be precluded from introducing evidence of a contemporaneous oral agreement, though a determination of the validity of such an agreement is not assumed by virtue of this evidence being admitted.

The question whether a parol agreement entered into contemporaneously with a written agreement may be considered valid and enforceable or merely negotiations or a prior agreement which has been either modified or superseded by the subsequent written agreement, is one in which the authorities are in serious dispute. A distinction is made between final and complete writings, *i. e.* fully integrated, or final but incomplete writings, *i. e.* partially integrated. This has been a major area of conflict between Professor Williston and Professor Corbin. The two schools of thought are as follows: Williston argues that the normal test for determining intent, if applied in this context, would effectively emasculate the parol evidence rule. 4 *Williston, Contracts* § 673 (3d ed. 1957), (hereinafter Williston). This appears to be the position taken by the *Restatement*. See *Restatement, Contracts* § 237 and comment (a) to that section. Corbin, on the other hand, takes the view that such expressions are prior or subsequent to the writing and thus, at the very least, superseded by the writing; however the writing itself does not control this determination. 3 *Corbin* § 577. This is also the position adopted by the Code. See U.C.C. § 2–202.

Thus Williston would have us exclude all evidence, relevant or not, except the written agreement. Whereas Corbin would require a review of evidence extrinsic to the writing, *i. e.* to what the parties have said and done, in order to determine their intent.

The touchstone of the rule is the integration of the written contract. The authoritative statement in New Jersey regarding integration is found in the *Schwimmer* decision *supra*. This case adopts the position of Professor Corbin that the intent of the parties is not to be determined solely by reference to the four corners of the written agreement.

Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties; but the intent must be judged by an external standard. * * * 'The document alone will not suffice. What it was intended to cover cannot be known till we know what there was to cover. The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered.'

\* \* \* \* \* \*

Thus, the basic question here is whether the parties assented to the writing as the complete integration of their agreement. The writing itself is not conclusive of this issue.

*Schwimmer, supra* 12 N.J. at 304–306, 96 A.2d at 657. *See also Lawrence v. Tandy & Allen, Inc.*, 14 N.J. 1, 100 A.2d 891 (1953). Older cases might indicate otherwise, *e. g. Crewe Corp. v. Feiler*, 49 N.J.Super. 532, 140 A.2d 411 (App.Div.1958), *rev'd on other grounds*, 28 N.J. 316, 146 A.2d 458 (1958); *Brautigam v. Dean & Co.*, 85 N.J.L. 549, 89 A. 760 (Supreme Court 1914), *aff'd* 86 N.J.L. 676, 92 A. 344 (E. & A. 1914), but it is clear that *Schwimmer* is now the definitive case in this area.

The evidence here shows that, at most, the negotiations were preliminary to the contract. If such an important matter as forbearance were to have been made a part of the contract, or the basis of a separate

## 1334

contract, it would most certainly have been referred to. The testimony indicates the desperation of Northrop. It was incumbent upon them to preserve their rights at any cost. Inclusion of such an agreement would have been against their best interests. It is significant that there was no testimony, other than that of Doyle, indicating that such an agreement had ever been entered into, and that this alleged agreement was never a part of the discussion during the two days of negotiations. Furthermore, the June 8th agreement would be contradicted by the oral agreement in that the June 8th agreement places no restrictions on the ability to exercise its creditors' rights and the oral agreement does.

 "The evidence produced by the [plaintiffs] seeking to establish an oral agreement, . . . is wholly unconvincing on the merits, . . . All of the testimony indicates nothing more than a vague and uncertain statement . . . ." *Kaplan v. Kaplan*, 4 N.J.Super. 554, 557–558, 68 A.2d 271, 272 (App.Div.1949). For this reason and the reasons stated above I must conclude that the agreement of June 8th was fully integrated.

Any contract, however, made or evidenced, can be discharged or modified by subsequent agreement of the parties. No contract whether oral or written can be varied, contradicted, or discharged by an antecedent agreement. Today may control the effect of what happened yesterday, but what happened yesterday cannot change the effect of what happens today. This, it is believed, is the substance of what has been unfortunately called the "parol evidence rule".

3 *Corbin on Contracts*, § 574 at 371–372 (1960).

It cannot be gainsaid that the antecedent oral contract, alleged to have been entered into on the evening of June 7th cannot modify, supersede or have any effect on the written agreement entered into on June 8th. Its jural effect has been nullified by the subsequent contract.

If the foregoing is true of antecedent contracts that were once legally operative and enforceable, it is equally true of preliminary negotiations that were not themselves mutually agreed upon or enforceable at law. The new agreement is not a discharging contract, since there were no legal relations to be discharged; but the legal relations of the parties are now governed by the terms of the new agreement. This is so because it is the agreement of today, whether that which happened yesterday was itself a contract or was nothing more than inoperative negotiation.

*Corbin*, at 376–378.

As I noted in my finding of fact, the alleged oral agreement evidently did not amount to anything more than mere negotiations if it was even that.

Assuming, arguendo, that the agreement was fully integrated, and that the oral agreement was in fact an agreement and not merely preliminary negotiations, there are several other reasons why it is not valid and enforceable.

 First, it is hornbook law that in order for there to be a valid and enforceable contract there must be a meeting of the minds. In this case the primary witness for the plaintiffs, and the president of the company, Doyle, testified that he was aware that Stevens, the negotiator for the defendant, could not commit Northrop to any of the terms alleged to have been agreed to by Northrop in the oral agreement. Further, no evidence, other than that of Doyle's testimony, was ever introduced to indicate assent to such an agreement. Failing a meeting of the minds, there could be no contract.

Second, the defendant alleges that there was no consideration for the oral agreement and therefore it was a mere *nudum pactum*. The plaintiffs present a somewhat novel argument. They allege that the consideration recited in the subsequent written agreement was also the consideration for the prior oral agreement.

 This argument is original not so much because it posits that consideration in one agreement may act as consideration in

another, but because of the approach. The normal argument usually runs as follows: One agreement is entered into supported by consideration, then another agreement is entered into relying on the past consideration. *Thermoid Co. v. Consolidated Products Co., Inc.*, 7 N.J. 283, 289, 81 A.2d 473 (1951); or two agreements are entered into simultaneously one with consideration and the other relying on the consideration in the other. *Lawrence v. Tandy & Allen*, 14 N.J. 1, 9, 100 A.2d 891 (1953). *See Corbin* § 125; *Restatement, Contracts* § 83. Here, however, the plaintiffs argue that the consideration for the oral agreement reached on the evening of June 7th was supported by the consideration of a contract not yet entered into. The plaintiffs fail to cite any authority to support this proposition and a thorough review of the case law has failed to disclose any. Therefore, while it is correct that one consideration may be sufficient to support multiple promises or contracts, application of that rule in this case would clearly be unwarranted.

Lastly, the defendant alleges that the oral agreement is invalid and unenforceable in that it is vague and indefinite as to its duration or is violative of the statute of frauds. The plaintiffs assert that:

[W]hile it is true that the agreement to forbear did not place an exact calendar date as to its terminus, the conditions specified by the parties were finite and fixed. In this respect, Northrop committed itself, following assumption of direct control over the GERI Board, to infuse new capital into GERI's operations to accomplish one of three objectives: (1) the attainment of a prominent position by GERI in the field of nuclear construction; (2) the attainment by GERI of an "Improved Financial Condition", as defined by the various written agreements between the parties; or (3) the orderly completion of GERI projects without disrup-

tion or interference in these operations. Either of these contingencies was finite and sufficiently specific to constitute an ascertainable date.

Plaintiff's supplemental brief, at 6–7.

Courts sometimes make a distinction between cases in which the terms of a contract are vague or indefinite, and cases where a material term is omitted. In the latter situation the reasonable conclusion, and the one adopted by the Code,[10] is that the terms will be supplied by implication. In the former situation, however, the court will not find there to have been a valid contract.

A court cannot enforce a contract that is too vague. *Caullett v. Stanley Stilwell & Sons, Inc.*, 67 N.J.Super. 111, 115, 170 A.2d 52 (App.Div.1961). It is not the business of courts to make contracts. Where the terms of a contract are so vague or indefinite that the intent of the parties cannot be determined, it will not be enforced. A court will not, however, impose an unreasonable burden upon the parties.[11]

The few cases in New Jersey which have discussed this matter are in accord. They hold that an indefinite extension of time within which to repay is ineffective. *Byerly v. Randolph*, 103 N.J.L. 240, 242, 133 A. 40 (Supreme Ct.1926); *Oetjen v. Robinson-Rodere Co.*, 98 N.J.L. 282, 117 A. 629 (Supreme Ct.1922). *See* 35 A.L.R.2d 1090. Though the duration of forbearance is not indefinite in the literal sense, as it was in the cases cited above, practically its duration was infinite and thus those cases would control.

As the plaintiffs so aptly point out, "the terminus of the agreement has no exact calendar date." Its duration is to be measured by the length of time necessary to complete one of the three objectives. A review of the recent history indicates that it is unlikely, at best, that any of those

**10.** U.C.C. §§ 2–204(3), 2–305, 2–308, 2–309, 2–310.

**11.** The Code has adopted a very liberal position requiring only that the parties agree to the most important matters, *e. g.* amount. This

bare bones contract will suffice in most circumstances leaving the parties or the court to determine the rest. See § 2–204. The liberal approach has not been applied in this area, however.

alternatives were or are ever going to materialize. Consequently, the duration is sufficiently indefinite that the agreement could not be enforced.

The next matter raised by the defendant is the statute of frauds. It contends that if the Court were to find that there was a definite duration to the oral agreement, it would violate the statute of frauds. This Court by letter requested briefing of this issue and only the defendant replied.

N.J.S.A. 25:1–5 ,provides, in part:

No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized:

\* \* \* \* \* \*

(e) An agreement that is not to be performed within one year from the making thereof.

In discussing the statute of frauds, *Corbin* has stated, at § 444, 535:

To fall within the words of the provision, therefore, the agreement must be one of which it can truly be said at the very moment that it is made, "This agreement is not to be performed within one year"; in general, the cases indicate that there must not be the slightest possibility that it can be fully performed within one year.

See *Loeb v. Peter F. Pasbjerg & Co.*, 22 N.J. 95, 123 A.2d 522 (1956); *Shiddell v. Electro Rust-Proofing Corp.*, 34 N.J.Super. 278, 112 A.2d 290 (App.Div.1954); *Renault v. L. N. Renault & Sons*, 188 F.2d 317 (3d Cir. 1951).

 In this case, of the three events which were supposed to occur, none could have possibly happened within a year's time. The company was in such a bad state of affairs that even with the infusion of large amounts of capital, attainment of any of those goals would have taken at least three years, as is indicated by the testimony of the plaintiffs' chief witness.[12]

 Lastly, even were I to find that this was sufficiently definite and without the statute of frauds, it is vague in certain respects and could not be enforced on those grounds. After the date the oral agreement is alleged to have been made, money was loaned by the defendant. The agreement does not specify if those loans are also meant to be covered. If they are, there is a problem with that also, in that agreements to extend time to pay must be made subsequent to the date of payment. *Marneil Realty Corp. v. Twin Brook Realty Corp.*, 119 N.J.Eq: 205, 181 A. 882 (Ch.Div.1935), 13 N.J.Misc. 419, 179 A. 110; *Parker v. Jameson*, 32 N.J.Eq. 222 (Ch.Div.1880). This would also apply to the fund paid to Manufacturers Hanover Trust Co. because the demand for payment on those agreements was not made until October of 1976, some four months after the agreement. Further the agreement fails to provide for treatment of GERI's obligation with regard to payment of the principal and/or interest during the alleged period of extension.

For these reasons the oral agreement could not be enforced, even if I were to find the June 8th agreement to have been only partially integrated.

Lest it be forgotten, this matter was instituted by the plaintiffs for a determination of the rights of the materialmen and laborers insofar as they may be affected by a foreclosure action by the defendant. To some extent this matter has been discussed in other sections of this opinion. However, I feel that it is necessary to deal with this matter more fully so as to dispose of this last possible impediment in the defendant's attempt to foreclose its security interest.

In the main the plaintiffs' claim is based upon the belief that the defendant may not seek to foreclose its security interest because there are debts still owing to materi-

---

12. *See, Fidelity Union Trust v. Reeves*, 96 N.J.Eq. 490, 125 A. 582 (Ch.Div.1924), *affirmed*, 98 N.J.Eq. 412, 129 A. 922 (E. & A. 1925); *Eiseman v. Schneider*, 60 N.J.L. 291, 37 A. 623 (Supreme Ct.1897); *See also Corbin* § 446.

almen and laborers. The statutes upon which this claim is based are N.J.S.A. 2A:102–10 [13] and 11.[14]

I find no fault with the contention that the rights of the materialmen and laborers are superior to those of secured parties. *Stevlee Factors, Inc. v. State*, 136 N.J.Super. 461, 346 A.2d 624 (Ch.Div.1975). The major difficulty I have with the plaintiffs' argument is with the result they reach. They contend that because there may be some $10,000 due and owing to laborers and materialmen the defendant should be estopped from attempting to collect some 29 million dollars. Clearly this was not the import of this statute. For obvious reasons I find the plaintiffs' argument to be patently ridiculous. Even assuming I found the claim of the plaintiffs that money is currently due and owing to the laborers and materialmen to be meritorious, it would be simple enough to have the defendant submit a bond in the amount alleged to be due and then allow it to proceed against the collateral. For these reasons I find the plaintiffs' claim to be ineffective to deny the defendant its rights under the security agreements.

There is currently due and owing from plaintiffs to the defendant the sum of $29,544,358 which sum is inclusive of principal and accrued interest through December 1, 1977, plus the cost of collection, including, without limitation, reasonable attorney's fees, as provided for in the agreement of April 22, 1976 at paragraph 12.2. This amount is currently due and owing as a result of the plaintiffs' acknowledged default under the agreement of April 22, 1976, set forth in the written agreement of June 8, 1976 and Northrop's exercise of creditor's rights by its demand letter of October 22, 1976.

Plaintiffs make a last ditch effort to urge this Court to find that M. J. Doyle, as opposed to GERI, is not indebted to Northrop. Plaintiffs do not even favor this Court with either citation to legal authority or anything else for that matter. The first time that this question was ever raised was when the plaintiffs submitted their proposed Findings of Fact and Conclusions of Law.

It is unclear what this argument is directed towards. Clearly M. J. Doyle, through William Doyle, was a party to the notes and a recipient of the advances from Northrop thus it would appear to mean that M. J. Doyle is exonerated from any claims under the security agreements. Nevertheless, I find it difficult to believe that this is what the plaintiffs could have meant in that in their initial pleadings in this case they indicated that M. J. Doyle Inc. was subject to the demand of Northrop and was a party to the security agreement. Further Northrop

13. N.J.S.A. 2A:102–10 reads as follows:

All moneys received by a contractor from the owner or mortgagee of real estate or any leasehold or other interest therein, for the purpose of having a building erected, constructed, completed, altered, repaired or added to, are trust funds in the hands of the contractor to be applied to the amount of all claims due or to become due and owing to the contractor to all persons furnishing labor or materials to him for the erection, construction or completion of the building or any alteration, repair or addition thereto, and any other reasonable and necessary charge in connection therewith. Any contractor or any officer, director or agent of the contractor, who pays or consents to the appropriation of such funds for any other purpose prior to the payment of all claims and charges for the payment of which the funds constitute a trust fund, is guilty of a misdemeanor.

14. N.J.S.A. 2A:102–11 reads as follows:

All moneys received by a subcontractor from the owner or mortgagee of real estate, or any leasehold or other interest therein, or from a contractor, for the purpose of having a building erected, constructed, completed, altered or repaired or added to, are trust funds in the hands of the subcontractor to be applied to the amount of all claims due or to become due and owing from the subcontractor to all persons furnishing labor or material to him for the erection, construction or completion of the building or any alteration, repair or addition thereto, and any other reasonable and necessary charge in connection therewith. Any subcontractor, or any officer, director or agent of the subcontractor, who pays or consents to the appropriation of such funds, for any other purpose prior to the payment of all claims and charges for the payment of which the funds constitute a trust fund, is guilty of a misdemeanor.

had perfected its security interest, *vis a vis* M. J. Doyle, back in March of 1976.

There have never been any proofs presented in this case which have established the incorporation or existence of M. J. Doyle Inc. Indeed the only references to it were made in an affidavit of William Doyle, wherein he states that the former division of GERI was a corporation on September 21, 1976, some six days after Northrop indicated there would be no more funds forthcoming.

 M. J. Doyle was a division of GERI throughout the entire period of funding by the defendant. It is now allegedly a 100% subsidiary of GERI. As a former subsidiary it is subject to the judgment of indebtedness to defendant and as a present subsidiary it remains subject to the security interest granted the defendant. Thus, there is no basis for the Court to conclude that M. J. Doyle Inc. is not indebted to the defendant.

The defendant is entitled to foreclose on the collateral granted in its agreements of March 5, 1976 and April 22, 1976. This right is derived from the default of plaintiffs and the defendant's subsequent attempt to exercise its creditor's rights. Section 9–501 of the Code as adopted in both New Jersey, N.J.S.A. 12A:9–501 and California West's Ann.Comm.C. § 9501,[15] provides that upon default by the debtor the secured party may reduce his claim to judgment and foreclose on the collateral.

As a matter of final relief the defendant has requested an accounting. Earlier in these proceedings I granted the defendant's request for an interim accounting. It is obvious to me that in order to enable the defendant to foreclose on the collateral there will have to be a full accounting and it will be so ordered.

With regard to the request for injunctive relief, I find no reason to grant such relief. The plaintiffs have, to date, been unable to show any reason for the granting of such relief. *See ·Constructors Association of*

*Western Pa. v. Kreps*, 573 F.2d 811 (3d Cir. 1978). Additionally the plaintiffs' request for declaratory relief is equally without merit. The plaintiffs have failed to show that there are any claims subject to the trust fund statutes and they have failed to show any outstanding federal, state or local taxes or union fringe benefits. Therefore, the plaintiffs having failed to show any reason to grant the relief requested, the relief is denied and the complaint is dismissed on the merits.

---

15. California adopted the revised Article 9, L.1974, c. 997, eff. Jan. 1, 1976. The differences between the New Jersey § 9–501 and California's § 9–501 are *de minimus*.