GEORGE M. BREWSTER & SON, INC., A NEW JERSEY CORPORATION, FOR THE USE AND BENEFIT OF THE TRAVELERS INSURANCE COMPANY, A CONNECTICUT CORPORATION AUTHORIZED TO DO BUSINESS IN NEW JERSEY, PLAINTIFF-APPELLANT, v. CATALYTIC CONSTRUCTION COMPANY, A DELAWARE CORPORATION AUTHORIZED TO DO BUSINESS IN NEW JERSEY, DEFENDANT-RESPONDENT.

Argued October 18, 1954—Decided December 13, 1954.

*Mr. George P. Moser* argued the cause for appellant (*Mr. William V. Roveto,* on the brief).

*Mr. John E. Hughes* argued the cause for respondent (*Mr. William T. McElroy,* on the brief; *Messrs. Shaw, Hughes & Pindar,* attorneys).

The opinion of the court was delivered by

HEHER, J. George M. Brewster & Son, Inc., a New Jersey corporation, sues to the use of The Travelers Insurance Company, a Connecticut corporation authorized to pursue its business in New Jersey, for indemnification for "actual losses and damages suffered" by Brewster within the understanding and meaning of a contract between it and the defendant Catalytic Construction Company, a Delaware corporation, made March 12, 1948. Brewster's "losses" were satisfied by Travelers pursuant to a policy of liability insurance issued by it to Brewster before the making of the contract of indemnity in suit; and Travelers now invokes the right of subrogation reserved by its policy and to that end the action is brought for its benefit as the use plaintiff. The defense is that the stipulated indemnity covers only "actual loss," and Brewster "admittedly suffered no actual loss" since the "loss" in question was within the coverage of Travelers' indemnity policy and thus Brewster was saved harmless, but, even on the contrary hypothesis, Brewster's loss is of a nature not within the ambit of the contractual indemnity.

There was judgment of involuntary dismissal in the Law Division of the Superior Court. The case is here by certification, on our own motion, of plaintiff's pending appeal to the Appellate Division.

By the contract of March 12, 1948, in form a letter addressed by Brewster to Catalytic, accepted by Catalytic in writing at the foot of the letter, the former "rented" to the latter, "on a month to month basis, for a minimum period

of three months, subject to cancellation after the three-month period by either party," on *30 days' advance notice in writing,* "a 40 Ton Manitowoc Speed crane, Model 3000 Special, Full revolving gasoline crawler crane, * * * mounted on all-steel chain driven crawlers, * * * equipped with a Wisconsin Gasoline engine, a special open throat heavy duty crane boom 100' long, complete for regular hook and crane service," at a "monthly rental rate" for the "bare machine" of $1,868, "f. o. b. trailer our yard, Bogota, N. J., based on 240 hours per month plus 50% of this rate for all hours over 240 per month." It was stipulated, *inter alia,* that the "rental period shall start on the date the equipment leaves" Brewster's yard at Bogota, New Jersey, "for delivery to" Catalytic's "job at Tidewater Associates Oil Company, foot of East 22nd Street, Bayonne, N. J., and shall continue uninterruptedly until the date the equipment is returned" to Brewster's yard at Bogota, "or equivalent distance." Catalytic undertook to pay all transportation charges "on this shipment from" Brewster's yard at Bogota to its "job at Bayonne," and "in returning" the equipment "on the expiration of the rental" to Brewster's yard at Bogota, "or equivalent distance." Catalytic promised to "furnish all fuel, lubricants, etc.," to "employ" Brewster's "operators and pay them their regular New Jersey rate of wages," "to maintain the equipment in first-class condition at all times during the rental period," and to return it to Brewster at the close of the rental period "in the same condition as when received, less ordinary wear and tear," or, in the event of "total loss," to "reimburse" Brewster for its "present value of $30,000." Catalytic also agreed to "assume full responsibility" for the equipment "during the rental period," and Brewster disclaimed "all liability for loss of time or damage on account of accidents, delays due to defective material, or to motor or engine troubles, or excessive consumption of fuel or lubricant or delays in the delivery or removal of equipment," and "for loss of time due to weather or surface conditions or temporary suspension of work."

And then comes the indemnity clause:

"It is understood and agreed that you (Catalytic) indemnify us against all loss, damage, expense and penalty arising from any action on account of personal injury or damage to property occasioned by the operation and handling of this equipment during the rental period, or any extension thereof.

It is understood and agreed that we (Brewster) shall be saved harmless from all court actions and all claims for injuries to persons or property, occasioned through the equipment while in your possession."

The equipment was not to be "moved to any other project" without Brewster's consent; and in the event of damage "in excess of ordinary wear and tear," Brewster could "take possession * * * upon 24 hours notice."

It was stipulated, in the pretrial order and in the course of the trial of this action, that on March 22, 1948 Joseph Roberts, Joseph Demyanovich and Arthur Hansen "were employees" of the defendant Catalytic, and on that date "these three employees were injured as the result of being struck by a falling boom of a crane * * * owned by" the plaintiff Brewster, and "At the time of the accident * * * the defendant was engaged in doing work at the Tidewater Associates Oil Co., foot of East 22nd St., Bayonne, N. J. where the three employees of defendant * * * were engaged in working for defendant, and at said time the crane heretofore mentioned was on the site of said job, having been taken there pursuant to" the stated agreement of March 12, 1948; that these three "employees of defendant brought suit against Brewster for personal injuries" which eventuated in judgments of $25,000 for Roberts, $5,000 for Demyanovich, and $10,000 for Hansen; that Brewster gave Catalytic due notice of the commencement of the actions, and demanded that it defend, but the demand was refused, and thereupon Travelers, on Brewster's behalf, undertook the defense of the actions under its policy issued to Brewster; that after recovery of the judgments, and their affirmance on appeal, *Roberts v. Geo. M. Brewster & Son, Inc.*, 13 *N. J. Super.* 462 (*App. Div.* 1951), certification denied 7 *N. J.*

582 (1951), payment was demanded of Catalytic and refused, and full satisfaction was then made by Travelers conformably to the indemnity policy, in coverage more than sufficient to liquidate the recoveries and all the expenses incurred in the defense of the actions.

The complaint herein was amended to assert a right of subrogation in Travelers in virtue of the express terms of the policy. It is agreed that the policy was issued to Brewster for a term of three years commencing June 12, 1947; that the premium was paid by Brewster, and the indemnity thereby provided covered the liabilities thus reduced to judgment.

By answers to interrogatories, Catalytic acknowledged that in accordance with its directions the crane was "delivered" by Brewster to Catalytic on "March 19, 1948, to the job site at the Tidewater Associates Oil Co., foot of East 22nd Street," in Bayonne, and it "was in the process of being placed into position for operation at the time the boom fell"; that "immediately before the accident, the crane had been standing still at the scene of the accident for about ten minutes" and "the boom fell just as the crane started up or was about to start up again in motion"; that the crane was "rented or used" by Catalytic from March 19, 1948 to August 9, 1948, and rent was paid by it for that period; and that Catalytic "paid the wages of the person operating the crane and boom on March 22, 1948, at the time the boom fell," and deducted or made payment "of unemployment compensation, social security and withholding taxes from the wages of the operator of the crane and boom at the time it fell."

The operator of the crane, then concededly in Catalytic's immediate service and pay, although he was "sent" to the "job at the Tidewater plant" by Brewster, testified that the boom, "at a near horizontal position," fell while the caterpillar crane "was walked along," "crawling with the mechanism" to "bring it in to where" they "were working," in keeping with Catalytic's directions. The witness said that this was his first connection with the crane on this operation, and he undertook to move the crane to the site of the "lifting operation," and "it was then for the first time going

to a place where it could do some work on the Catalytic job"; the "rig wasn't standing still when it actually happened; the rig was standing still, and then when I was told to move the rig, that's when the boom came down."

## I

Catalytic maintains at the outset that the contractual indemnity is against "actual loss" rather than "any liability which Brewster might incur," turning to the principle of *Westville Land Co. v. Handle*, 112 *N. J. L.* 447 (*Sup. Ct.* 1934), and the mere entry of judgment against Brewster in the tort action brought by the injured workmen, later "actually paid" by Travelers under their liability policy, was not a "loss" sustained by Brewster within the meaning of the indemnity clause of the contract, an issue resolved in its favor by the Superior Court. It is said that thereby Brewster seeks "to change the nature of the contract of indemnity from one of indemnity against loss to one of indemnity against liability for loss and ignores the basic distinction between the two."

But the differentiation is illusory. The reasoning gives an undue and distorted significance to Brewster's protection, at its own expense, against loss that could ensue should Catalytic default in the performance of its own contractual undertaking to indemnify Brewster against the selfsame loss, by means of the additional security afforded by a policy of liability insurance according to the usual course of sound business economy and practice, a contractual arrangement in which Catalytic had no interest whatever expressly conditioned upon the insurer's right of subrogation, a reserved right that of necessity entered into the *quantum* of the premium. This contract with Travelers was not offensive either to positive law or to public policy; and it worked no prejudice to the rights of Catalytic arising out of its relations with Brewster.

The juristic effect of a contract is of necessity governed by the expressed intention of the parties. We look

for the operative meaning of the symbols of expression designed to affect their legal relations. Their unexpressed intention is immaterial, save when the equitable remedy of reformation is sought. *Corn Exchange National Bank and Trust Co. v. Taubel*, 113 *N. J. L.* 605 (*E. & A.* 1934). Generally, a contractor is bound according to the meaning that he "induces another to understand and act upon, if he knows or has reason to know that the other will so understand and act"; and in this inquiry the surrounding circumstances are relevant and competent. *Corbin on Contracts, section* 538. Of this, more hereafter.

There was no undertaking by Brewster to provide such insurance for Catalytic's benefit. This was not within the contemplation of the parties. Catalytic did not covenant to indemnify Brewster against the stated losses only in the event of default by the indemnitee's insurance carrier; nor was that an implied limitation upon the contractual indemnity, for that would subvert the obvious sense and significance of the words used to express the common intention. Indemnity arises from contract, express or implied. *Westville Land Co. v. Handle,* cited *supra.* It is not of the judicial function to enlarge or restrict the normal usage of the tokens of intention, save as may reasonably be necessary to serve the general design and purpose of the contract; the intention manifested in the writing is the thing sought. This is basic interpretive principle. *Gusaeff v. John Hancock Mutual Life Ins. Co.*, 118 *N. J. L.* 364 (*Sup. Ct.* 1937).

Subrogation is an ancient equitable device to compel the ultimate discharge of an obligation by one who in good conscience ought to pay it. In a comprehensive review of the nature of the doctrine and its relation to indemnity, Mr. Chief Justice Vanderbilt pointed out that the right "does not arise out of contract but rather exists without the consent of the insured, although of course the parties may by agreement waive or limit the right"; the subrogee "in effect steps into the shoes of the insured and can recover only if the insured likewise could have recovered"; and it is now the settled rule that generally an action in subrogation "on the

contractual obligation of the defendant to an insured exists in favor of the insurer." *Standard Accident Ins. Co. v. Pellecchia*, 15 *N. J.* 162, 172, 178 (1954). *Vide Federal Insurance Co. v. Engelhorn*, 141 *N. J. Eq.* 349 (*E. & A.* 1948).

In the *Pellecchia* case the Chief Justice referred to cases that bear analogy to the case in hand. In *F. H. Vahlsing, Inc. v. Hartford Fire Insurance Co.*, 108 *S. W. 2d* 947 (*Tex. Ct. Civ. App.* 1937), the insurer of a railroad company paid fire damage to cars of the insured railroad and, under a subrogation clause of the policy, brought an action against the railroad's lessee of sheds and buildings who had agreed to be responsible for cars in the demised premises, including the cars damaged. Judgment for the insurers was sustained on the theory that "if the railroad company would be entitled to recover for the loss as against the appellant, the insurance company in this action stands in its shoes and would also be entitled to recover." And the insurer of Pullman sleeping cars destroyed by fire while on the railroad lessee's premises, under the railroad's agreement with the Pullman Company to be responsible for loss or damage to the cars, was held entitled to recover against the railroad, as subrogee, in Pullman's name. *Chicago, St. Louis & New Orleans Railroad Co. v. Pullman Southern Car Co.*, 139 *U. S.* 79, 11 *S. Ct.* 490, 35 *L. Ed.* 97 (1891). This was the holding there:

"Upon payment of the loss, or to the extent of any payment by them on account of such loss, the insurance companies were subrogated to the rights of the insured, and could, in the name of the insured, or in their joint names, maintain an action against the railroad company for indemnity, if that company was liable to the insured for the loss of the cars. The acceptance of a given amount from the insurance companies in full discharge of their liability did not affect the right of the plaintiff to recover from the railroad company the whole amount of the loss for which the latter was responsible under its contract. * * * The inquiry in this action is as to the amount for which the railroad company is bound on its contract with the plaintiff, and the recovery is not affected or limited by the amount collected from the insurance companies."

■ As the Chief Justice said in the *Pellecchia* case, subrogation is highly favored in the law. Indemnitors are within the rule that the doctrine may be invoked in favor of one who is under a legal duty to repair a loss ensuing from the tortious act or omission of another. *Aetna Life Ins. Co. v. Moses*, 287 *U. S.* 530, 53 *S. Ct.* 231, 77 *L. Ed.* 477, 88 *A. L. R.* 647 (1932); *Travelers Ins. Co. v. Great Lakes Engineering Works Co.*, 184 *F.* 426 (*C. C. A.* 6 1911); *Regan v. New York & N. E. R. Co.*, 60 *Conn.* 124, 22 *A.* 503 (*Sup. Ct. Err.* 1891).

■ True, an indemnitor's liability is *strictissimi juris.* But the question is what the parties by their expression have willed as to their legal relations; and it is fairly to be presumed that they have contracted in the context of these well-established legal principles and a purpose to alter their operation would be manifested in suitable terms. There is no such showing here. We have no doubt from what was said that the indemnitee's liability insurance was not within the view of the parties, as a basic condition of the bargain; indeed, we are clear it was not within the minds of the contractors at all. In the quest for the common objective, contracts of indemnity, like all other contractual arrangements, are to receive a reasonable construction to serve and not subvert the general design of the stipulation. All interpretive canons are in aid of the intention of the contractors; they must not be arbitrarily applied; and thus made the means of thwarting the reason and spirit of the written expression, the repository of the consensual undertaking.

■ *Westville Land Co. v. Handle, supra,* distinguished between contracts of indemnity against loss and agreements of guaranty, involving in their very nature an inquiry as to the intention in the particular case, holding that there the contract was in plain terms one of indemnity merely and not an absolute guaranty of payment in reduction of the mortgage, and the loss was not determinable until foreclosure and sale of the lands. The distinction arises out of the contract of the parties, express or implied. The contractors are free to

cast their agreement in their own terms, provided there is no violation of positive law or an overriding public policy.

## II.

But were the losses represented by the judgments recovered by the injured workmen in nature such as to be within the coverage of the contractual indemnity? This inquiry the Superior Court resolved in the negative.

Brewster argues that the crane and boom were rented to Catalytic as "a bare machine"; Catalytic assumed "full responsibility for the equipment during the rental period"; Brewster "assumed no liability for the loss of time or damage on account of accident, delays due to defective material or to motor or engine troubles or excessive consumption of fuels and lubricants," and the like, but "was to be saved harmless and indemnified from all or every loss or damage * * * in consequence or by reason of the maintaining in action or the manipulation, treatment or use of the equipment, or by means of the equipment or because of it throughout the continuance or course of the rental period and as long as the equipment was in Catalytic's possession." The "two indemnity provisions" are read as "separate and distinct covenants," entirely consistent: "one concerning the operation or running or use of the machine; the other concerning the equipment itself." Catalytic urges that the word "occasioned" suggests "causation of contemplated loss" as of the essence of the right to indemnity—*i. e.*, by the first paragraph of the indemnity clause, "the loss had to be caused by the operation and handling of the equipment"; and by the second paragraph, "the loss had to be caused by the equipment." And, moreover, so runs the argument, "the causation itself was further limited to causes that arose during particular periods,"—*i. e.*, by the first paragraph, "during the rental period"; and by the second paragraph, "while the equipment was in the possession of Catalytic," and these essential factors are conclusively negatived by the judgment in *Roberts v. Brewster*, cited *supra*.

 There is in the particular terms of indemnity a want of the nicety and artistry of expression that makes for clarity and certainty of meaning. Looseness of language ofttimes suggests confusion of ideas in the user's mind that of necessity tends to confound the process of interpretation. But, as Professor Corbin says, "A clear and definite mind is a rarity; an artist in the use of words is as great a rarity." *Corbin on Contracts, section* 534. In the uncertainty of usage, the judicial interpretive authority seeks for the meanings each party intended to convey by his words and acts, and for the meanings these words and acts conveyed to the other party, *Ibid., section* 538; and in the case of an integration the quest is for the reasonably certain meaning of the language used, taken as an entirety, considering the situation of the parties, the attendant circumstances, the operative usages and practices, and the objects the parties were striving to achieve. *Corn Exchange Bank & Trust Co. v. Taubel,* cited *supra*; *Bullowa v. Thermoid Company,* 114 *N. J. L.* 205 (*E. & A.* 1935); *Casriel v. King,* 2 *N. J.* 45, 53 (1949); *Atlantic Northern Airlines v. Schwimmer,* 12 *N. J.* 293 (1953). Poverty of language is sometimes a factor to be regarded; but, whatever the difficulty, the chosen words and phrases are to be realistically assessed, in relation to the context and the obvious general purpose of the compact, for the meaning that is reasonably clear, such as is within the reasonable understanding of the symbols of expression. In this, we find the true standard if the function of interpretation is to be fulfilled.

We turn now to the operative meaning of the terms of indemnity in use here.

 There are apparent differences in the language of the first and second paragraphs of the indemnity provision. But they are seeming and not real, when taken and compared together in the context of the general design of the contract. The significant words would seem to be "operation and handling"—*i. e.,* operation, handling and use of the equipment in the doing of the work for which it was leased to the indemnitor. And this postulates as an inherent term

of the contract the provision of a crane and boom reasonably suitable and safe for the stipulated use when delivered to the indemnitor, and certainly a breach of this condition prerequisite, rendering the indemnitee directly liable in damages for its own negligence, would not be within the coverage of the indemnity clause, absent a clear and unequivocal expression to that end. Compare *Southern Bell Telephone & Telegraph Co. v. Mayor and Board of Aldermen of City of Meridian, Miss.,* 74 *F.* 2d 983 (*C. C. A.* 5 1935); *Boston & M. R. R. Co. v. T. Stuart & Son Co.,* 236 *Mass.* 98, 127 *N. E.* 532 (*Sup. Jud. Ct.* 1920); *George H. Dingledy Lumber Co. v. Erie R. Co.,* 102 *Ohio St.* 236, 131 *N. E.* 723 (*Sup. Ct.* 1921); *Payne v. National Transit Co.,* 300 *F.* 411 (*Dist. Ct. W. D. Pa.* 1921), affirmed *National Transit Co. v. Davis,* 6 *F.* 2d 729 (*C. C. A.* 3 1925), *certiorari* denied 269 *U. S.* 579, 46 *S. Ct.* 104, 70 *L. Ed.* 422 (1925). This was the case here. The crane was not then capable of the lifting operation for which it was designed, and for which it was rented, due to a mechanical deficiency attributable to Brewster's want of care over a period of time; and the boom fell in the very first endeavor to put the crane into normal use after it came into Catalytic's possession, a mishap not within the contractual indemnity unless the words be given an arbitrary sense and import plainly out of keeping with the essential reason and spirit of the contract. And such is the rationale of the judgments recovered by the injured workmen. The case of the workmen was submitted to the jury on two theories of fault imputable to Brewster: (1) Brewster supplied a "defective and dangerous" crane to Catalytic; (2) "negligence" by the operator of the crane, laid to Brewster under the doctrine of *respondeat superior* on the assumption that the operator was also subject to a measure of control by Brewster. There was a general verdict and judgment against Brewster. *Roberts v. Brewster,* cited *supra.* In our understanding of the factual presentation in that case, the operator of the crane was not guilty of negligence unless he, too, defaulted in the delivery to Catalytic, without forewarning of danger, of a mechanism unsafe for

immediate use; and actionable fault in this regard would not for the selfsame reason be within the terms of the indemnity.

At all events, there was no demand for a direction that the jury particularize its findings according to *R. R.* 4:50–1–2, and thus by a special verdict reveal the adjudicated facts; and so the verdict is to be deemed a finding against Brewster on all issues submitted to the jury, and from this it is fairly to be presumed that the verdict and judgment proceeded on the basic finding that Brewster was at fault in delivering to Catalytic a mechanism unsuitable and unsafe for use, and such was the principle of the recoveries.

The record of the judgments in favor of the workmen was introduced into evidence by Catalytic. Brewster maintains that "in view of the stipulations concerning the amounts of the judgments, the institution of suit in the *Roberts* case, the rendering of judgments in favor of the injured plaintiffs against Brewster, and the subsequent payment thereof, and the fact that the incident occurred while the crane and boom were on the job site where it had been delivered pursuant to the lease-contract to Catalytic, it became unnecessary to rely upon the record of the previous case to establish these facts."

But it would seem to be axiomatic that Brewster may not invoke the record of the judgments for the workmen to prove the losses thereby sustained, and the occurrence of the "incident"—the tortious injuries—while the mechanism was "on the job site where it had been delivered" to Catalytic under the contract, and at the same time deny its delivery to Catalytic of a "defective and dangerous" mechanism as the ground of the liability established by the judgment record itself. Having invoked the judgment record, Brewster is on the plainest considerations of reason and logic precluded from impugning either the ruling principle or the basic facts adjudicated as revealed by the record, and thereby asserting in effect that the recoveries were erroneous. Where the indemnitee relies on the judgment against him in the earlier action, as the basis of his right of recovery over, he

"must take for better or worse the adjudicated facts on which the judgment rests." *Builders Supply Co. v. McCabe,* 366 *Pa.* 322, 77 *A.* 2d 368, 24 *A. L. R.* 2d 319 (*Sup. Ct.* 1951). See also *Crawford v. Pope & Talbot, Inc.,* 206 *F.* 2d 784 (*Ct. App.,* 3 *Cir.,* 1953). He cannot both approbate and reprobate. It did not suffice here to prove merely that the mishap occurred while the crane was on the "job site." This proceeds from a fundamentally mistaken view of the contract. Further than this we need not go in assessing the doctrine of estoppel by judgment.

▋ In sum, we are convinced that such was the common understanding of the terms of the indemnity. Travelers' indemnity was broader than Catalytic's. If the second paragraph of Catalytic's promise was designed to have the extensive meaning now attributed to it, why the limited coverage of the first? The general words are controlled by the specific. *Restatement, Contracts, section* 236. Only in this wise can there be a reasonable understanding of the terms as a whole.

Thus it is that the cause of action pleaded in behalf of the use plaintiff has not been sustained.

Affirmed.

VANDERBILT, C. J. (dissenting). I differ from the majority in their interpretation of the indemnity clause of the lease agreement. The first paragraph thereof restricts indemnity to losses "occasioned by the operation and handling of this equipment." If that were the only indemnity provision I would agree with the majority that the judgments in question do not fall within the terms of the indemnity clause.

We must, however, wherever possible, give effect to all of the terms of the agreement. The second paragraph provides that the defendant shall save the plaintiff harmless from all claims "occasioned through the equipment." The plain meaning of these words is that, in addition to liability for losses due to the negligent operation of the equipment provided under the first paragraph, the defendant assumes liability for claims in connection with the equipment which

as here result from defects in the equipment, even if such defects are solely attributable to the plaintiff. In my opinion, the second paragraph of the indemnity agreement is entitled to as much weight as the first paragraph. It is not inconsistent with the first paragraph and to treat it as subordinate material is, in effect, to delete it from the agreement.

I would reverse the judgment and remand the case to the trial court for the entry of a judgment in favor of the plaintiff.

*For affirmance*—Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Chief Justice VANDERBILT—1.