In the Matter of Norman FALK, Debtor.

CITY FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff,

v.

Norman FALK, Debtor, & Michael G. Busche, Receiver, Defendants.

Bankruptcy No. B–76–2664.

United States Bankruptcy Court, D. New Jersey.

Feb. 7, 1980.

Ravin, Katchen & Greenberg, Newark, N.J., by Richard B. Honig and Howard Greenberg, Newark, N.J., for plaintiff.

Markowitz & Zindler, Lawrenceville, N.J., by Michael A. Zindler and John E. Adams, Jr., Lawrenceville, N.J., for defendant/debtor.

Fontanella, Shashaty, Harris & Lalomia, Paterson, N.J., for defendant/receiver.

Michael G. Busche, Hamburg, N.J., receiver.

## OPINION ON COMPLAINT OF CITY FEDERAL FOR RELIEF FROM STAY

RICHARD W. HILL, Bankruptcy Judge.

Chapter XI proceedings were filed by Norman Falk on October 23, 1976. Nearly a year later, on August 15, 1977, City Federal Savings and Loan Association, (hereinafter City Federal), filed a complaint against the debtor, Falk, and the Receiver, Michael G. Busche, for relief from the automatic stay of Rule 11–44, seeking authorization to foreclose a mortgage on two parcels of property in Richland Township, Quakertown, Pennsylvania, in which the Debtor had an interest. Debtor filed a counterclaim in which he alleged that City Federal breached its construction loan agreement with debtor. On its counterclaim the debtor sought damages, a reduction in the amount due on its mortgages and also an order prohibiting City Federal from proceeding with foreclosure.

By provisions in the Pretrial Order, the value of the property on which City Federal had a first mortgage was fixed, for purposes of this litigation, at $528,600.00.[1] The amount claimed due on City Federal's mortgage as of December 7, 1977, of $370,196.25 was not disputed, except to the extent that judgment on the counterclaim would be a set off. For all practical purposes, the trial was restricted to the issues raised by the counterclaim.

The debtor, Falk, is an officer and stockholder in a family-owned corporation, Falk of Bethlehem, Inc.,[2] with his parents, Oscar and Leah Falk,[3] and his brother, Stephen Falk. In 1973, debtor became interested in developing a small shopping center in Richland Township, Quakertown, Pennsylvania, and entered into a contract to purchase two tracts containing 33 acres of land from Frank Kranzel and Rose Farber.[4] The larger parcel of land, approximately 22 acres, is the subject of this litigation. Utilizing the Bucks County Industrial Development Authority (hereinafter referred to as BCIDA), Falk was to obtain low-interest financing for construction of the proposed shopping center. Under the arrangement, BCIDA was to act as "nominee" owner and mortgagor of the property.[5] The store, when com-

pleted, was to be leased to Falk of Bethlehem, Inc., for a rental at least sufficient to carry all mortgages on the property. Blue Ridge Construction Inc. contracted with Falk to do the general contracting work at a price of $1,880,000.00.

Debtor and BCIDA obtained financing for the project from City Federal who took a first mortgage on the larger tract. The project was commenced but never completed. Blue Ridge stopped construction when it did not receive satisfactory progress payments.[6] The heart of debtor's counterclaim[7] is that City Federal wrongfully delayed, withheld, or limited progress payments and that this resulted in the stoppage of construction. City Federal's basic defense is that progress payments were not made because of the debtor's failure to comply with the terms of the mortgage commitment and other City Federal requirements.

To understand the contractual relationship between Falk and City Federal it is necessary to detail the various transactions that led up to this litigation. On or about January 2, 1974, City Federal approved a loan to BCIDA in the amount of $1,800,-000.00. This sum was subsequently in-

1. The Order provided for acceptance of the appraisal made on April 20, 1977, by a Court designated appraiser unless a timely objection was raised. None was raised. City Federal had a first mortgage on a 22 acre tract and a second mortgage on an 11 acre tract located across the highway from the first tract.

2. Falk of Bethlehem, Inc. and many related concerns filed Chapter XI petitions in New Jersey on January 8, 1976. Each corporation was adjudicated bankrupt on June 27, 1977. See Nos. B–76–71 to B–76–77.

3. Oscar and Leah Falk, and their partnership, Falk and Falk, filed Chapter XI petitions on March 26, 1976, which are still pending. See Nos. B–76–981 to B–76–983.

4. Debtor made a down payment of 29%. The sellers, Farber and Kranzel, agreed to take back a purchase money mortgage on the property for approximately $490,000.00, with a first mortgage on the 11 acre tract and a second mortgage subordinate to City Federal's construction loan on the 22 acre tract.

5. Interest paid by BCIDA was exempt from taxation. Accordingly, a mortgage could be obtained at a lower interest rate.

6. The construction loan agreement provided that "(a)dvances for general construction work shall not be made more frequently than semi-monthly."

7. A recent decision by the Third Circuit would appear to preclude consideration by this Court of debtor's counterclaim. *See In Re Roloff,* 598 F.2d 783 (3d Cir. 1979). The *Roloff* court held that the Bankruptcy Court, in determining whether to lift a stay, was without summary jurisdiction to hear a debtor's affirmative defenses and counterclaims. *Id.* at 785–88. The instant case, however, was litigated without any objection to jurisdiction. Because of City Federal's failure to object to jurisdiction, it is deemed to have consented to this Court's jurisdiction. Bankruptcy Rule 915.

creased to $1,870,000.00[8] to cover the debtor's cost of commercial lease insurance[9] which was required under the commitment. On March 27, 1974, City Federal issued a formal mortgage commitment letter to BCIDA outlining the terms and conditions of the loan. Pertinent sections provided that: (1) mortgagor was to obtain commercial lease insurance from Commercial Lease Insurance Corporation (hereinafter CLIC) for 15 years; (2) the principals of Falk of Bethlehem, Inc. would be personally liable; (3) 10% of the face amount of the loan or $187,000.00 would be withheld from construction advances until construction was completed and supported by an Architects Certificate of Occupancy; (4) an amount equal to that required to satisfy the CLIC insurance premium would be withheld and forwarded to CLIC; (5) debtor would pay at closing a non-refundable 1% commitment fee; (6) the parties would execute a construction loan agreement although the terms were not specified; and (7) City Federal's counsel would review and approve all papers prior to closing.

A "dry" closing occurred on June 17, 1974, between Falk, BCIDA, Blue Ridge, Kranzel and Farber. City Federal disbursed no monies that time. It executed no documents. In fact, no representative of City Federal was present at the closing which was held in Pennsylvania.

The papers executed at the closing by parties other than City Federal included the Construction Loan Agreement between City Federal and BCIDA, a promissory note for the sum of $1,870,000.00 with interest at 8% per annum from BCIDA to City Federal and a mortgage on the Richland property from BCIDA to City Federal. On that same date Falk formally assigned his contractual rights to the Richland property to BCIDA, the latter taking title. Simultaneously, BCIDA entered into an installment

sales contract with Falk pursuant to which BCIDA sold the premises to Falk and Falk undertook all responsibilities for construction and repayment of the loan to City Federal. Rights under the installment contract were then assigned by BCIDA to City Federal to secure the amount of the mortgage. On that same date Falk entered into a construction contract with Blue Ridge Construction Inc. for $1,880,000.00 which was then assigned by Falk to BCIDA.

It should be noted at this juncture that City Federal's formal contractual relationship was with BCIDA and not Falk. Falk, however, and not BCIDA, was clearly the real party in interest. Nevertheless, formal lines of legal communication ran between City Federal's counsel and BCIDA's counsel.

Construction on the project began immediately after this "dry" closing. Construction advances were requested by BCIDA at the end of June, July and August. However, no advances were made by City Federal until October 2, 1974. The initial October 2nd advance of $227,352.00 was some $33,000.00 less than that anticipated by Blue Ridge. The almost four-month hiatus between the start of construction and the advance of construction monies and the amount of money ultimately advanced is at the heart of Falk's counterclaim.

From City Federal's perspective, the delay in making any advance and the amount of the ultimate advance on October 2nd was perfectly appropriate and in accordance with its agreement. According to City Federal, the delay in making any advance arose from Falk's failure to provide a title policy issued by a satisfactory title insurance company and a further failure to obtain appropriate endorsements from CLIC. The $33,000.00 reduction in the first construction advance included the $18,700.00 commitment fee, payable at closing,[10] plus an addi-

---

8. From the very outset, it must be clear that City Federal did not agree to fund the entire construction cost. The construction contract was $1,880,000.00. Only $1,800,000.00 of the $1,870,000.00 was intended for construction.

9. The Court understands that such insurance, in effect, guarantees a project's income and is thus a source of funds from which mortgage payments can be made.

10. The commitment fee was not paid at the time of closing.

tional 5% or $14,500.00 holdback to insure the availability of money for the CLIC premium.

To fully understand how these positions developed it is necessary to examine more closely the relationship between the parties at or about the time of closing. As noted, City Federal was not present at this "dry" closing.

The commitment letter provided that BCIDA's counsel prepare all relevant documents and submit them to City Federal's counsel for review and approval seven days prior to the anticipated closing.[11] On June 17, 1974, the date of closing, Gary Turndorf, City Federal's attorney, wrote to Robert Valimont, BCIDA's attorney, and raised many questions as to the sufficiency of the documents. Among the comments in that letter were the following:[12]

1. Notation that Berks Title Insurance Company was not on City Federal's approved list;

2. Additional requirements regarding lease insurance;

3. A final requirement that the mortgagor satisfy "the commitment."

Three letters were addressed from Valimont to Turndorf on June 18th, two indicating copies to Falk's attorney, Goodman.[13] In addition to forwarding pertinent mortgage documents to Turndorf, the letters indicate a telephone conversation between Turndorf and Valimont during the "dry" closing on June 17th and Valimont's recognition that despite the "dry" closing there were items remaining to be accomplished along the following lines:

1. Securing City Federal's approval of Berks Title Insurance Company;

2. A recognition on behalf of BCIDA that City Federal would be able to withhold from construction advances the $70,000.00 lease insurance (CLIC) premium;

3. Recognition that the commitment fee question would be worked out with Norman Falk.

A construction loan agreement, requiring the signature of City Federal, was enclosed with one of Valimont's June 18th letters.[14] The construction loan agreement, executed by City Federal, was returned to Valimont by Turdorf on June 21st, "upon the express understanding that there are conditions which remain to be satisfied to the satisfaction of City Federal Savings and Loan Association before any disbursement will be made."[15]

The Court is absolutely satisfied that in the context of the "dry" closing, the conditions on the delivery by City Federal of the construction loan agreement included the three conditions noted *supra*. Not only is it clear that the attorney for BCIDA was aware of these and other conditions that still had to be satisfied, but the Court also believes that it is a reasonable inference that Norman Falk and his counsel were aware of these problems at or about the time of closing.[16]

The dispute in this case involved, essentially, the timeliness and amount of payments made by City Federal to Blue Ridge. After the closing the debtor advised Blue Ridge to begin construction of the shopping center. On or about June 18, 1974, Blue

---

11. The record does not clearly establish when the documents were submitted for review. A title report from Berk's Title was submitted sometime in April.

12. Precisely when this letter was received was not developed in the record. BCIDA's attorney responded to it on June 18, 1974.

13. These two refer both directly and indirectly to the third letter. Norman Falk obviously had copies of those letters. See C-6 Ev.

14. J-16 Ev.

15. C-15 Ev.

16. Turndorf's June 17th letter was also sent to Falk's attorney. Falk and his attorney were present at the dry closing on June 17th. Valimont talked to Turndorf on June 17th during the closing. Two of Valimont's letters were surely sent to Falk's attorney. All three letters were surely in Falk's possession on July 19th (See C-6 Ev.). The Court concludes that at all relevant times Falk or his attorney knew that City Federal had a number of open items and that advances would not be made until those open items were resolved.

Ridge commenced construction. On July 9, 1974, Blue Ridge submitted a requisition for $114,419.00 for work up through the last day of June, approved by BCIDA and Falk. City Federal refused to pay that requisition. Subsequent requisitions submitted to City Federal were, likewise, declined by City Federal. Blue Ridge walked off the job in the middle of September, never to return except to winterize the project. On October 2, 1974, Blue Ridge received its first check in the sum of $227,352.00.

To resolve this dispute requires the Court to decide what the parties agreement was on each issue. This in turn requires the Court to apply the parol evidence rule which cannot be applied until a decision is made as to what law controls the decision of this case.

## I. DOCUMENTS THAT CONSTITUTE THE AGREEMENT OF THE PARTIES

To dispose of debtor's counterclaim, this Court must first determine what documents or other data constitute the agreement between the parties. The debtor seeks to limit the agreement to the construction loan agreement. City Federal wants the Court to include other documents, particularly the commitment issued March 24, 1974.

The Court is satisfied that New Jersey law governs the interpretation of the loan agreement.[17] At trial, both parties stipulated they were satisfied New Jersey law should govern.

To determine which documents reflect the parties' agreement requires an examination of the parol evidence rule. The

Court notes that the parol evidence rule is a rule of substantive contract law and not a rule of evidence. It is not related to the issue of admission of evidence. *United States v. Clementon Sewerage Authority*, 365 F.2d 609, 613 (3d Cir. 1966); *Doyle v. Northrop Corp.*, 455 F.Supp. 1318, 1332 (D.N.J.1978); *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 302, 96 A.2d 652 (1953). The rule provides that if the parties have stated the terms of their contract in the form of a complete integration it cannot be varied or contradicted by proof of antecedent negotiations or agreements. 3 *Corbin on Contracts*, Section 573 (1960); *Northrop Corp., supra* at 1333; *Schwimmer, supra* at 302, 96 A.2d 652. The touchstone of the rule is the integration of the written contract. *Clementon Sewerage Authority, supra* at 613; *Northrop Corp., supra* at 1333. "An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted." Restatement of Contracts, Section 228 (1932); *Clementon Sewerage Authority, supra* at 613; *George M. Brewster & Son, Inc. v. Catalytic Construction Co.*, 17 N.J. 20, 109 A.2d 805 (1954). *Graybar Electric Co., Inc. v. Continental Casualty Co.*, 50 N.J.Super. 289, 294, 142 A.2d 114 (App.Div.1958). The parol evidence rule itself does not, however, establish the fact of "integration." *Clementon Sewerage Authority, supra* at 613; see 3 *Corbin on Contracts*, Section 573 (1960). To establish the fact of integration, the New Jersey Courts adopt the position of Corbin and admit extrinsic evidence to determine the intent of the parties. *Clementon Sew-*

---

17. The Court must decide whether to apply New Jersey or Pennsylvania law. While City Federal was a New Jersey based corporation, debtor's corporation, Falk of Bethlehem, Inc., had its primary situs in Pennsylvania. Moreover, the site of construction was in Pennsylvania. No issue is presented as to the validity or interpretation of the mortgage itself. It is the general rule in New Jersey that the validity, interpretation and legal effect of a contract is governed by the law of the state in which it is made. *See Colozzi v. Bevko, Inc.*, 17 N.J. 194, 202, 110 A.2d 545 (1955). This general rules does not, however, preclude the parties from expressly providing what law is to govern. *See Mullaly v. Carlisle Chemical Works, Inc.*, 177 F.Supp. 588, 593–94 (D.N.J.1959). The one requirement is that the state's law which the parties have chosen must bear a "reasonable relation" to the transaction involved. *See Doyle v. Northrop Corp.*, 455 F.Supp. 1318, 1326 (D.N.J.1978); *In re Lea Fabrics, Inc.*, 226 F.Supp. 232, 236 (D.N.J.1964). Taking into consideration the situs of at least one party, City Federal, in the state of New Jersey, the choice of New Jersey law meets such a "reasonable relation" test.

erage Authority, supra at 613; Northrop Corp., supra at 1333. The authoritative statement on integration is found in the Schwimmer case which provides:

> Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties; but the intent must be judged by an external standard. The writing is not "wholly and intrinsically self-determinative of the parties' intent to make it the sole memorial" of the subject of negotiation; this intent "must be sought where always intent must be sought, namely, in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice. What it was intended to cover cannot be known till we know what there was to cover. The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered."

> \*     \*     \*     \*     \*     \*

> Thus, the basic question here is whether the parties assented to the writing as the complete integration of their agreement. The writing itself is not conclusive of this issue.

Schwimmer, supra, 12 N.J. at 304, 306, 96 A.2d at 657, 658; See also Lawrence v. Tandy & Allen, Inc., 14 N.J. 1, 8, 100 A.2d 891 (1953).

In light of the evidence, discussed above, most particularly the series of letters exchanged among the parties during the period of June 17th to June 21st, the Court is satisfied that the parties did not intend the construction loan agreement to be the final and complete agreement between them. In its letter of June 17th to Valimont, City Federal made it clear that it regarded the terms of the mortgage commitment to be part of the agreement. Valimont's letters of June 18th to Turndorf indicate a recognition on the part of Valimont and BCIDA that indeed the still unsatisfied terms of the commitment were part and parcel of the loan agreement. The telephone conversation of June 17th that took place at the closing between Valimont and Turndorf, referred to in Valimont's June 18th letter, again indicates that there were still matters to be worked out between the parties, matters not memorialized in the construction loan agreement executed at the dry closing. The Court also finds debtor's and BCIDA's acquiescence in the terms of the commitment significant.[18] At various times during the period of June through September BCIDA and debtor made continual representations to City Federal that they were attempting to comply with the commitment requirements. The Court must conclude that it was the clear intent of the parties that at the very least the terms of the mortgage commitment letter constituted, along with the construction loan agreement, the understanding between the parties.

Of fundamental significance, City Federal never unconditionally delivered the construction loan agreement. "(T)he mere fact that there were minor details to be agreed upon in the future would not preclude the court from finding a contract. But where the acceptance is made 'subject to' the execution of such a formal agreement, such acceptance is noted by Williston to be conditional and of no effect." Looman Realty Corp. v. Broad Street National Bank of Trenton, 74 N.J.Super. 71, 83, 180 A.2d 524, 530 (App.Div.1962); See also Whiteman Food Products Co. v. Arrigoni & C., 27 N.J.Super. 359, 366, 99 A.2d 434 (App.Div. 1953), rev'd sub nom. Whiteman Food Products Co. v. Prodotti Alimentari, 31 N.J.Super. 277, 106 A.2d 321 (App.Div.1954); Larsen & Fish, Inc. v. Schultz, 5 N.J.Super. 403, 405, 69 A.2d 328 (App.Div.1949). Certainly until the conditions of delivery were met the construction loan agreement could not be considered the integrated agreement of the parties.

The Court is thus satisfied that the operable integrated agreement between the parties included the mortgage commitment of March 27, 1974.

---

18. By letter of July 29, 1975, to Thomas J. Magovern of City Federal, debtor indicated his attempts to meet the "additional conditions." See J-19 Ev.

## II. CITY FEDERAL'S ALLEGED BREACH OF ITS AGREEMENT

■ Having determined to its satisfaction that debtor was aware of the various problems surrounding the terms of the loan agreement at or about the time of closing, the Court must examine whether the conduct of City Federal in delaying payment was, nonetheless, a breach of the loan agreement between it and debtor.

### A. Requirement as to Title Insurance

Subsequent to the June 17th closing, certain requirements of the mortgage commitment remained outstanding, from the viewpoint of City Federal. The most significant item holding up construction advances was the acquisition by the debtor of a title policy satisfactory to City Federal.[19] According to City Federal, Berks Title, the title company chosen by debtor, was not on City Federal's approved list. Debtor claims, however, that he had paid $7,000.00 for a title policy from Berks as of the closing, that a copy of the policy had been sent to City Federal as early as April of the same year,[20] and that City Federal never objected to Berks.

The Court recognizes that neither the construction loan agreement, nor the mortgage commitment letter specifically required Falk to obtain title insurance from an insurer approved by City Federal. In fact, the commitment letter said nothing about title insurance, although it is clear that all parties assumed it to be a requirement.

The title company issue is difficult because of the absence of an express clause in the commitment requiring title insurance from a company on City Federal's approved list. Nevertheless, the Court is satisfied that City Federal, in this instance, acted appropriately in refusing to advance monies or unconditionally execute a construction loan agreement until a title policy was issued by an approved company.

The commitment not only required approval by City Federal of all documents, it also required execution by the parties of a construction loan agreement. It is this loan agreement which would ultimately obligate City Federal to lend money. The general language of paragraph two of that agreement recites receipt by City Federal, "in form approved by Bank . . . of appropriate evidence of title"—the appropriate evidence of title being the title policy of Berks. Given the magnitude of the transaction and the requirement that the parties enter into a construction loan agreement, insistence by City Federal on an "approved" title insurance company was appropriate. Certainly City Federal could not be expected to execute any construction loan agreement unless it possessed satisfactory title insurance, much less a construction loan agreement stating that in fact such appropriate title insurance had been obtained.[21] Furthermore, the evidence is clear that City Federal advised the debtor prior to the start of construction that appropriate title insurance was required before monies would be advanced.

It is equally clear that from the time of the "dry" closing Falk, in fact, undertook to correct the title insurance deficiency. It appears, however, that only minimal effort was made by the debtor to expedite the forwarding of necessary paperwork, which included a financial statement by Berks. A satisfactory arrangement with City Federal regarding title insurance was not arrived at until the end of September, 1974, when Lawyers Title, an approved company, assumed the responsibility for title insurance with Berks acting as its agent. A few days later, payment for requisitions numbers 1,

---

19. Under the general terms of the construction loan agreement, debtor was required to deliver to City Federal "appropriate evidence of title."

20. Surprisingly enough the debtor had initially sought to use Chicago Title. BCIDA, however, insisted on using Berks.

21. It must be recalled that City Federal delivered the construction loan agreement on condition, one of which was clearing up the title insurance problem.

2, and 3 was forwarded to Blue Ridge by City Federal.[22]

Under the terms of the construction loan agreement it was, in the opinion of this Court, the responsibility of the debtor to deliver to City Federal an acceptable title insurance policy. It was, in fact, debtor's responsibility to see that *all* loan documentation was submitted to and approved by the bank. According to testimony from debtor, such documentation was not received in its entirety before June 17th. This Court believes that City Federal's refusal to pay requisitions based upon the title policy problem was not unreasonable. The loan was one for a substantial amount of money and the acquisition of proper title insurance was, therefore, imperative.

The debtor proceeded with construction knowing full well that the title company matter was open and had to be resolved. The debtor should not have let nearly three months go by before remedying what debtor conceded in his testimony to be a "minor" problem.

## B. *CLIC Endorsements*

Another item that held up payment of requisitions was the omission on the part of debtor of certain paperwork regarding the CLIC insurance. At the time of closing debtor had paid for a preliminary binder for the lease insurance. The papers submitted were not acceptable to City Federal's counsel, however, as they lacked certain endorsements. Not until the end of August, 1974, were all problems resolved with respect to the lease insurance. The debtor was on notice of these problems. There is no evidence that City Federal breached any agreement by insisting that the missing endorsements be obtained before advancing construction funds.

22. The Court is satisfied that City Federal made payment promptly after Lawyers vouched for Berk's rundown search. An actual title policy had been issued by Lawyers Title early in September, 1974, effective June 18, 1974.

23. The disbursement was computed as follows:

## C. *Withholding of Additional Monies from Construction Advances*

Debtor has alleged that City Federal breached the terms of the construction loan agreement when it withheld extra monies from the construction advance to cover a portion of the CLIC premium, and the 1% commitment fee. The requisition in question, labeled No. 1, 2, 3 inclusive, and dated August 29, 1974, sought $290,179.00 less the 10% retainage of $29,018.00 called for in the construction agreement. If the $290,179.00 figure was appropriate the net due Blue Ridge under its contract was $261,161.00. Instead it only received $227,352.00 because of the extra monies withheld.[23] The debtor refers specifically to paragraph five of the construction loan agreement which provides that "payment made pursuant to each . . . voucher shall be the allocated cost less the percentage of hold back as set forth in the general building contract, which shall not be less than 10%." The building contract with Blue Ridge provided for a 10% retainage. Debtor takes the position that the retention by City Federal of an extra 5% of the request to accrue monies for the CLIC premium amounted to a unilateral modification of the contract by City Federal. According to debtor, such modification was never mutually agreed to between himself and City Federal, and created a default situation between contractor Blue Ridge and debtor.

A close reading of the construction loan agreement and the mortgage commitment letter, which this Court has determined to be part of the integrated agreement between the parties, leads this Court to the conclusion that City Federal did not breach its loan agreement when it deducted an extra 5% retainage from the October, 1974, advance to Blue Ridge.

| | |
|---|---|
| Gross Request: | $290,179.00 |
| Less 10%: | 29,018.00 |
| Subtotal: | 261,161.00 |
| Less 5% for CLIC: | 14,509.00 |
| Amount advanced: | $246,652.00 |
| Less 1% commitment fee: | 18,700.00 |
| Less legal fee to City Federal's counsel: | $600.00 |
| Total available to Blue Ridge: | $227,352.00 |

Debtor argues that City Federal requested and received a copy of the construction contract between debtor and Blue Ridge. That contract provided for a 10% retainage from each payment. Debtor, likewise, notes that under the terms of the construction loan agreement the debtor was to deliver said contract to City Federal. A distinction must be made, however, between the construction contract between debtor and Blue Ridge and the construction loan agreement with City Federal. These are two separate contracts. Any discrepancy between the monies provided under the two contracts was the responsibility of the debtor.[24] Additionally, testimony from debtor indicates that the amount that City Federal was obligated to advance was never intended to cover the entire cost of construction.[25] Debtor, rather, anticipated that after requisitions had been honored by City Federal, there would still be a shortfall of approximately $100,000.00 which debtor would personally have to honor.

Debtor asks that the Court look at paragraph four of the construction loan agreement:

> If at anytime during the progress of the work, the Bank shall reasonably estimate that the undisbursed balance of the Loan is insufficient to pay for the completion of the work, Bank may, by written notice, demand that a deposit be made with it in the amount of the deficiency as estimated by the Bank which BCIDA and Purchaser shall thereupon promptly deposit.

Debtor argues that there is no other provision in the construction loan agreement providing for the withholding of any amount for the CLIC premium. According to the debtor, this Court could accept paragraph four of the construction loan agreement as dispositive of the manner in which any mo-

nies due to cover the premium would be collected. However, since the mortgage commitment letter speaks more directly to the CLIC premium and must be considered part of the contract, that paragraph is controlling.

Paragraph three of the mortgage commitment letter states that "an amount equal to that required to satisfy the CLIC insurance premium, will be withheld and forwarded to CLIC upon their request and issuance of the Certificate of Insurance." The Court could interpret this clause in three different ways: the Bank would either 1) withhold 100% of the premium or $70,000.00 from the first advance; 2) withhold a certain percentage from each advance (5%); or 3) disburse monies until there was $70,000.00 left to cover the premium. The premium was to become due on the date the tenant took possession of the building. City Federal has suggested to the Court that its understanding of the clause was that it withhold a percentage from each advance. Testimony of Thomas J. Magovern, Vice President of City Federal, further suggests that at a meeting with debtor and Magovern it was orally agreed that the $70,000.00 would be retained by taking it out of advances on a proportionate basis. Debtor denies any such understanding with City Federal as of June 17th but the Court finds Magovern's testimony credible.

In any event, given the three alternative interpretations of that paragraph, City Federal's decision to withhold an extra 5% from the advances was not inappropriate or contrary to the letter or spirit of the agreement with debtor. Relevant to the understanding between the parties is the letter from BCIDA's attorney to Turndorf on June 18, 1979. In that letter, Valimont

---

24. Testimony from both Herbert Vollers, President of Blue Ridge, and debtor allude to a proposed agreement between them, whereby debtor would pay Blue Ridge the 5% difference, or approximately $33,000.00. That agreement, however, was never finalized, for the following reasons. Debtor had verbally agreed with Blue Ridge to make up the deficit by payment of $10,000.00 a week. However, when debtor's attorney wrote a letter to Blue

Ridge suggesting payment in $1,000.00 increments, admittedly a typographical error, Blue Ridge found the suggested payments unacceptable.

25. The contract price between Blue Ridge and Falk was $1,880,000.00, while the construction loan, after subtracting the $70,000.00 allocated to the CLIC insurance premium, was only for $1,800,000.00.

authorized City Federal, on behalf of BCI-DA, to withhold the CLIC premium from the loan proceeds. The Court finds no evidence to support a finding that City Federal was required to hold off on collecting the premium until construction was complete. While the $70,000.00 was not to be due to CLIC until the end of construction, City Federal had an interest in seeing that it would be available and on hand when due. Furthermore, given the fact, admitted by the debtor himself, that he would have been unable to advance that sum at closing due to heavy up front costs, City Federal had reason to worry about debtor's financial position and his ability to have had the money available in the future. The debtor's position becomes even more obtuse when the Court considers that the original loan for $1,800,000.00 was increased to $1,870,000.00, specifically to cover the $70,000.00 premium. If, instead, as debtor suggests, payments had been made until $70,000.00 was left, debtor would have experienced, at the end of construction, just the same severe shortfall he sought to avoid at the onset. Debtor may not then have had the cash to pay such a substantial amount to the contractors. Therefore, not only was City Federal's action in line with the contract terms, but it also was an appropriate way to proceed from the debtor's standpoint.

Debtor objects to other deductions from the October 2, 1974, advance to Blue Ridge, particularly, a 1% commitment fee which amounted to $18,700.00. Debtor does not deny that such a fee was due under the mortgage commitment, but claims that the fee should have been deducted at the end of construction advances. The commitment itself states that the fee was to be paid on the day of closing. City Federal claims that there was an oral agreement between itself and debtor to take the fee out of the first advance. In its letter of June 18, 1974, to Turndorf, BCIDA indicated its understanding that this issue was to be worked out between the debtor and City Federal.[26] There is no evidence before the Court that such an agreement was consumated. Given the fact, however, that the original commitment called for the fee at closing, City Federal's withholding of it from the first advance does not appear, in the Court's opinion, to deviate from the terms of the agreement, nor constitute a breach of the agreement. Furthermore, the Court accepts the testimony offered on behalf of City Federal that in loans of this nature it was often the custom and practice to deduct the commitment or origination fee from the first advance.

Furthermore, when considering the question of construction advances as a whole, it appears that City Federal exercised its discretion when it made advances for items not required under the contract. The terms of the construction loan agreement indicate that City Federal was obligated to pay only for those materials "physically incorporated into the construction," although materials stored on the site were arguably considered to be incorporated into the work. Debtor's contract with Blue Ridge allowed for payment for stored materials, not necessarily on the site. Despite indications from City Federal to Blue Ridge that submitted requisitions were deficient since they included requests for materials stored "off-site" City Federal, in its October 2nd payment did, ultimately, pay for electrical work stored off of the site.[27] If, in fact, one breaks down the $227,350.00 payment made to Blue Ridge out of the $261,161.00 requested in combined requisitions 1, 2 and 3, it appears that payment might have actually been in excess of the amount City Federal would have tendered if it had subtracted off-site materials—materials not strictly covered by the contract.

Concededly, the issues in this case are not black and white ones. However, Blue Ridge has admitted that the reason it

---

26. See J 18 Ev.

27. The combined requisition totals for electrical work, off the site, was $48,117.00. Payment of

this amount was originally disapproved by Magovern. Subsequently, however, Magovern advanced money on that figure, treating it as an advance on land costs.

walked off the job was because payment was not made for three months. It is also clear that advances were held up by City Federal pending satisfaction of various terms and conditions contained in the mortgage commitment letter, the construction loan agreement and other papers related to the closing.

This Court must conclude it was debtor's responsibility under the contract to satisfy all the conditions of the loan. Debtor's delay in meeting these conditions held up the payment. This Court must, therefore, find that City Federal did not breach its contract with debtor.

### III. CITY FEDERAL'S AUTHORIZATION TO BLUE RIDGE TO PROCEED

Even though the Court is satisfied that City Federal did not breach its contract with Falk, the Court must, nevertheless, address Falk's argument that City Federal authorized Blue Ridge to proceed with construction. The factual basis for this claim is the testimony of Herbert Vollers, President of Blue Ridge, who testified that George Mikula, then Vice President of City Federal, verbally authorized Blue Ridge to proceed in a telephone conversation on June 18, 1974.

The Court accepts Vollers testimony on this issue as credible. Whatever effect such testimony may have in a suit between Blue Ridge and City Federal, the Court is satisfied that it cannot support a claim at this time by Falk against City Federal. City Federal's counsel unequivocally advised BCIDA's counsel on June 21st that no disbursements would be made until the open conditions were rectified. Falk either knew or should have known of this hold on disbursements. Nevertheless, he permitted construction to proceed. Under such circumstances, Falk may not rely on something said in a telephone conversation between City Federal and Blue Ridge.

The Court is satisfied under all the circumstances that a judgment of no cause of action should be entered on Falk's counterclaim against City Federal.

### IV. RELIEF FROM STAY

There remains to be considered City Federal's request for relief from the stay. That issue was neither briefed, nor argued to the Court. There appears to be substantial equity over City Federal's mortgage. When, however, the face amount of the Kranzel and Farber mortgage is considered there appears to be no equity.[28] The debtor has not filed a plan. To resolve this issue fairly the Court will conduct a supplemental hearing on February 28, 1980 at 2:00 p.m. in Courtroom # 4, 402 East State Street, US Courthouse & Post Office Building, Trenton, New Jersey. Letter memorandum on the issue shall be filed no later than February 25, 1980.

---

**28.** The amount due on that mortgage has not been established in this proceeding.